Jasen, J.
Whether the courts have power to enjoin, even temporarily, the administration of examinations to school pupils based on contentions that the integrity of the examinations had been fatally compromised is the issue presented for our consideration. Special Term, affirmed by the Appellate Division, granted a preliminary injunction against the scheduled administration of comprehensive reading and mathematics examinations to pupils throughout the entire New York City school system. There should be a reversal. The temporary injunction issued by the courts below was an unlawful interference with an educational policy judgment made by the *359 appropriate school authorities in exercise of constitutional and statutory power. Whether or not an examination had been so compromised as to strip it of validity as a device for measuring educational achievement is a matter committed to the professional judgment and discretion of those responsible for the administration of the public schools. It is not a matter for the courts.
The Chancellor of the City School District of the City of New York is required, by law, to "cause a comprehensive reading examination to be administered to all pupils in all schools under the jurisdiction of the community districts annually.” (Education Law, § 2590-j, subd 5, par [a].) Comprehensive examinations are not intended to measure the proficiency of particular students in a particular area of instruction as do, for example, the examinations administered annually under the direction of the State Board of Regents. Instead, comprehensive examinations are designed to provide an assessment of how programs in basic skills, reading and mathematics, conducted by the administering school district, compare in relation to national standards. Comparisons are drawn between current performance and performance registered in past years by students taking similar examinations at comparable points in the school year, as well as between the results obtained by the particular school district and results obtained by comparable districts elsewhere in the country. Test results are calculated on accumulation of individual student scores, yet programmatic assessment takes place at the school and district levels.
In New York City, the chancellor is mandated by statute to use comprehensive examination results to rank each school in order of the percentage of pupils reading at or above grade level. The ranking must be accomplished by October 1 of each school year. (Education Law, § 2590-j, subd 5, par [a].) Results are also used by both New York City and New York State educational authorities to satisfy requirements imposed by Federal law in connection with Federal educational assistance programs. (See, e.g., US Code, tit 20, § 241e, subd [a], par [6]; 45 CFR 116.31 [f].) In New York City, therefore, reading ability is tested at grades 2 through 9; and mathematics is tested at grade 5. Examination scores of individual students are considered, but are not determinative, in resolving such matters as promotional requirements for students, pupil admission to special programs and private schools, the organiza *360 tion of classes, teacher evaluation and assessment, class ranking, allocation of Federal, State and local funds, and in the allocation of teachers to schools.
For many years, the New York City school district utilized nonexclusive, nonsecure comprehensive reading tests developed by private publishers. These examinations are sold to, and used by, school systems throughout the country. Use of this form of testing permits a particular school system to measure performance of its pupils against the results obtained by students in other school districts using the same examination. Also, nonexclusive examinations provide a measure of economy since the cost of preparing the examination, and the profit of the private publisher, can be spread through the school districts purchasing the identical test. Use of nonexclusive tests, however, poses dangers that the examination might be compromised. Hence, the private publisher stores the examinations in secure warehouses, carefully regulates who may purchase, or have access to, the tests, and imposes security measures to be implemented in the course of examination administration.
Following administration of a comprehensive examination by New York City in 1974, there were allegations that cheating occurred in some of the city’s schools. An investigation revealed that there were instances of unacceptable examination practices. To avoid recurrence of these difficulties, the board of education decided to purchase and employ exclusive, secure tests for the 1975 and 1976 annual examinations. These tests were not previously administered in any school district in the country and the opportunities for prior disclosure, or cheating, were thereby reduced. New York City was the only school district in the country to administer, even briefly, a secure or exclusive comprehensive test. Despite additional security precautions and "the use of the secure form of examination, there were still allegations that cheating had occurred in both 1975 and 1976. The scores on both tests were appreciably higher than those of prior years, but, since the test had not previously been administered, scientifically accurate comparison was not possible.
A committee of teachers, superintendents and testing experts recommended a return to the prior practice of purchasing nonexclusive tests. The disadvantage of the exclusive test, the inability to compare results, was considered to outweigh whatever advantages lay with exclusive, supposedly more *361 secure, examinations. The board of education invited bids for the 1977 city-wide test and CTB/McGraw-Hill, a division of the McGraw-Hill Publishing Company, submitted the lowest bid, $408,000. The test purchased from McGraw-Hill, the Comprehensive Tests of Basis Skills, Form S, had been previously administered in four States and in at least 17 major cities throughout the country, including San Francisco, Los Angeles, San Diego, Washington, D.C., and Newark, New Jersey.
In accordance with usual practice, the examination was scheduled for late March. Beginning in January, 1977, the board began to distribute test instructions and materials. The actual examinations were delivered to schools two weeks in advance of the test date to permit teachers sufficient time to complete test forms. The forms required information that had to be obtained from the record cards of individual students. On March 16, 1977, the Community Superintendent of District 6 in Manhattan notified the chancellor that copies of the actual reading portion of the examination had accidentally been distributed as sample materials to schools within the district. By March 28, 1977, the day before the examination, District 6 reported that at least 30 classes had received advance disclosure of examination materials. Other districts also reported instances of premature release to students. Although the mathematics portion of the examination was not affected, the chancellor postponed the entire examination pending an investigation. The investigation disclosed that no more than 3,000 students had seen the reading portion of the examination. Since the examination was to be administered to approximately 720,000 students in 23,000 classes throughout the city, the chancellor concluded that the examination had not been fatally compromised. It was determined that Form S would be administered in those schools where no allegations of irregularity had been made or where irregularity had not been established. In schools that had been affected, an alternative form of examination would be utilized.
The petitioners, parents and teachers of students in various community school districts and the Superintendent of Community School District 4, contended that the irregularities were more widespread than believed by the chancellor. They unsuccessfully sought to obtain administrative relief from the New York City Board of Education and from the State Commissioner of Education. This proceeding was commenced, pursu *362 ant to CPLR article 78 to challenge the decision to administer the examination. A temporary restraining order was secured and the court subsequently granted the parties additional time within which to submit further affidavits. On April 11, 1977, the court granted petitioners a temporary injunction against administration of the test. The court acted solely on the strength of the papers submitted without holding a hearing.
. Special Term stated that the "unrefuted allegations by petitioners demonstrate that, apparently to avoid the cost of security measures, these examinations were delivered well in advance of the examination date, instead of being delivered to the teachers administering the examinations only at the time of the examinations, as was the prior practice.” The court agreed with petitioners that the examination had been fatally compromised. "The full and precise extent of the dissemination of the examinations may not be known, but it has plainly been pervasive. To administer these examinations now would be a futile exercise. To rely upon the results would be unfair to those who have lacked prior familiarity with the examinations.” Scheduling difficulties and the added expense of purchasing a new examination were held to be outweighed by the prejudice and harm which might result from the administration of a compromised examination. "The only appropriate conclusion, in this Court’s view, is for the compromised examinations to be entirely discarded, and new examinations, suitably secure, to be administered.” The court directed an expeditious trial of the factual issues.
The Appellate Division unanimoulsy affirmed the award of preliminary injunctive relief for the reasons stated by Special Term. The respondents indicated that they would apply to our court for leave to appeal. Since the intention to apply for leave to appeal automatically stayed enforcement of the preliminary injunction (CPLR 5519, subd [a]), petitioners requested that we vacate the automatic stay. On May 5, 1977, we denied the motion to vacate the statutory stay "to the extent only that the examination may be administered and graded except that the New York City Board of Education must not use or divulge the examination results or enter them against the individual records of students, unless authorized by this Court upon appropriate application, pending submission and determination of motions for leave to appeal.” A *363 motion for leave to appeal was made and, subsequently, was granted.
First, a matter of practice must be addressed. The power of our court to entertain this appeal having been decided in the motion for leave to appeal, attention must be focused on the nature of the order sought to be reviewed. Ordinarily, decisions on applications for injunctions, and provisional remedies generally, are within the discretion of the Special Term, and, perforce, the Appellate Division. In fact, when based on pure discretion, orders determining requests for preliminary relief are not even appealable to our court. (E.g., Walker Mem. Baptist Church v Saunders, 285 NY 462, 474, rearg den 286 NY 607; Hudson Riv. Tel. Co. v Watervliet Turnpike & R. R. Co., 121 NY 397; Paul v Munger, 47 NY 469, 473-474; cf. Rosemont Enterprises v Irving, 41 NY2d 829, 830.) Nonetheless, appeals are appropriately entertained where the action taken by the courts below presents a serious question of law determinative of the case. An appeal from an order granting a preliminary injunction lies if there are advanced serious legal arguments which raise a substantial question of abuse of discretion as a matter of law. (Cohen and Karger, Powers of the New York Court of Appeals, § 158, pp 615-619; 7 Weinstein-Korn-Miller, NY Civ Prac, par 5501.17; 7A Weinstein-Korn-Miller, NY Civ Prac, par 6301.13; cf. Patron v Patron, 40 NY2d 582, 585; Rosemont Enterprises v Irving, supra'.) Similarly, we may entertain an appeal which presents a significant issue as to whether, on the facts deemed to be established, the lower courts had the power to grant the injunctive relief that they did. (See Barclay’s Ice Cream Co. v Local No. 757 of Ice Cream Drivers & Employees Union, 41 NY2d 270, 271; Cohen and Karger, Powers of the New York Court of Appeals, § 157, pp 611-613.) In short, "whether, as a matter of law, there was a legal barrier to the exercise by the Appellate Division of its authority to grant an injunction pendente lite.” (41 NY2d, at p 273.) Finally, and traditionally, if it plainly appears on the face of the complaint that the case is one in which, under settled principles of law, the plaintiff, on the facts alleged, is not legally entitled to final relief, then a preliminary injunction in plaintiff’s favor is reviewable. (E.g., Hudson Riv. Tel. Co. v Watervliet Turnpike & R. R. Co., 121 NY 397, 399-400, supra; Birge v Berlin Iron Bridge Co., 133 NY 477, 483; Hatch v Western Union Tel. Co., 93 NY 640; McHenry v Jewett, 90 NY 58, 62; Collins v Collins, 71 NY 269, 271; Cohen and *364 Karger, Powers of the New York Court of Appeals, § 157, pp 609-611, and n 31.)
In this case, substantial questions have been raised as to the power of the courts below to interfere with matters of educational policy. If, as we will hold, the courts below were without authority to set aside, even temporarily, a policy decision by school administrators with respect to the integrity of a school examination, then the grant of preliminary injunctive relief is erroneous as a matter of law. Further, if judicial authority is altogether lacking, petitioners would not be entitled to the final relief, a permanent injunction, they seek. Therefore, it is concluded that the appeal is properly before us and that the order appealed from is reviewable. We turn, now, to the merits.
The conflicting contentions of the parties may be briefly summarized. The petitioners argue that the examination has been flagrantly compromised and use of the results under the circumstances would prejudice the decisions in which examination results may be a factor. It is particularly stressed that the test scores may be utilized in determining in what classes a student may be placed and whether a student will be admitted into special programs or into private school. It would be unfair, it is argued, if certain students obtained the benefit of specific coaching or advance perusal of the examination while others were not so privileged. The board counters by stressing that the instances of security breaches are relatively insignificant when compared against the total student population to be examined. The school authorities state that the percentage of irregularities is not high enough to warrant invalidation of the entire examinhtion. Further, it is asserted, advance coaching or knowledge would not, in the majority of instances, affect test results. The examinations are designed to measure basic skills Acquired over several years. In the space of a few weeks’ time, a student cannot significantly improve his reading skills nor acquire greater understanding of the principles of mathematics. Only sheer memorization of questions and answers could alter the outcome. In this respect, it is noted that the delay between the time of the security breaches and the date the examination was actually administered will serve to reduce the chances of successful memorization.
The City of New York constitutes but a single city school district (Education Law, § 2590.) While local district boards *365 have been granted considerable authority to operate the schools within their communities (see Education Law, § 2590-b, subd 2; § 2590-e), responsibility for decision-making on a city-wide level rests with a centralized administration. The chancellor is the chief executive officer of the school district (see Education Law, § 2590-h), but is subject to the general supervision of the board of education (see Education Law, §§ 2590-g, 2590-h; see, generally, Matter of New York City School Bds. Assn. v Board of Educ., 39 NY2d 111, 119). Yet the decisions of even the city-wide officials, both by Constitution and statute, are subject to review by the Commissioner of Education. The commissioner, a constitutional officer, is, in turn, under the supervision of the State Board of Regents. (NY Const, art V, § 4; art XI, § 2; Education Law, §§ 301, 305; see Matter of Ocean Hill-Brownsville Governing Bd. v Board of Educ., 23 NY2d 483, 485.) The Legislature has established a procedure whereby persons conceiving themselves aggrieved by specific acts of local school authorities or, indeed ”[b]y any other official act or decision of any officer, school authorities, or meetings concerning any other matter under this chapter, or any other act pertaining to common schools”, may seek review by the Commissioner of Education. (Education Law, § 310, esp subd 7.) Although petitioners sought administrative relief from both the city-wide board of education and the State Commissioner of Education, neither the board nor the commissioner saw fit to interfere with the chancellor’s determination to administer the examination.
Petitioners predicate their request for injunctive relief on the claim that results from a compromised examination might be unfairly used to influence significant decisions such as the promotion of pupils, admission of students to special programs and private schools, and allocation of teachers and funds within the school system. However, it is not contended, nor could it be, that, in the absence of some explicit statutory or constitutional violation, any of these decisions, reflective of educational policy judgments, would be cognizable in the courts. To be sure, where a statutory or constitutional provision is at root of a dispute, the courts may offer the definitive resolution of these issues of law. Similarly, where the educational authorities have acted in a judicial, or quasi-judicial capacity, judicial review is available, with the substantiality of the evidence constituting the standard to be applied. Illustrative of these principles are the myraid of tenure, racial *366 discrimination, and teacher dismissal cases heard by our courts. Although these matters touch, often deeply, educational policies, because discrete law issues are raised which are wholly apart from matters of policy, such issues are judicially cognizable.
Here, petitioners contend that judicial review may be had because the chancellor has an explicit statutory duty to administer a comprehensive reading test. (Education Law, § 2590-j, subd 5, par [a].) It is argued that, implicit in the statutory direction, is a requirement that the test be administered fairly and without undue advantage to particular students. With this argument, we have no disagreement. However, the nub of the issue is who is to decide whether a particular test, under the relevant circumstances, will satisfy the statutory direction. We conclude that the responsiblity for this determination rests with the chancellor and, in turn, the board of education and Commissioner of Education.
The statute itself places first instance responsibility upon the shoulders of the chancellor. The general legislative and constitutional system for the maintenance of public schools secures review by the board of education and, on the State level, by the Commissioner of Education. The purpose of these provisions "is to make all matters pertaining to the general school system of the state within the authority and control of the department of education and to remove the same so far as practicable and possible from controversies in the courts.” (Bullock v Cooley, 225 NY 566, 576-577; see, also, People ex rel. Board of Educ. v Finley, 211 NY 51, 57.) Indeed, at one time, the statute specifically forbade review of the commissioner’s decision "in any place or court whatever”. (Education Law, § 310, amd by L 1976, ch 857, § 1.) Although the determinations of the Commissioner of Education are now specifically subject to review, pursuant to CPLR article 78, in the same fashion as those of other administrative officers or bodies (see Governor’s Memorandum of Approval, 2 McKinney’s Session Laws of NY [1976], p 2450), the statutory alteration is of limited impact for, even under prior law, the courts possessed the authority to set aside the commissioner’s decisions if arbitrary or illegal. (See, e.g., Matter of Union Free School Dist. No. 2 of Town of Cheektowaga v Nyquist, 38 NY2d 137, 142; Matter of Baer v Nyquist, 34 NY2d 291, 298; Matter of Board of Educ. v Nyquist, 31 NY2d 468, 473, n 2; Matter of Vetere v Allen, 15 NY2d 259, 267, cert den 382 US 825.) Here, *367 it must be noted, the petitioners challenge only the determinations of the chancellor and city-wide board of education; the decision of the Commissioner of Education not to interfere is not disputed. Indeed, the commissioner is not a party to this proceeding, nor is he a party to this appeal.
The courts had no role, and it is not argued that they should have, in selecting the form of examination to be administered. Statute requires the administration of a comprehensive examination and the examination purchased, if simon-pure, would surely be adequate for the purpose. It is not for the courts to say that considerations of educational policy, of the needfulness to make valid comparisons, of the need to prevent cheating* of the need to keep down costs, should have led the chancellor, and the board, to purchase a different form of examination.
The chancellor has determined, as a result of investigation, that the examination actually purchased still has validity as an educational indicator. This conclusion is bottomed on the comparatively slim evidence of irregularity his investigation turned up, as well as upon his view that because of the very structure of the examination, cheating would have little impact. While petitioners have uncovered further evidence of irregularity, it cannot be said that the chancellor’s investigation was inadequate. Nor can this court evaluate the merits of petitioners’ disagreement with the educational assumptions relied upon by the chancellor. (Matter of Vetere v Allen, 15 NY2d 259, 267, supra.) Finally, the court is without power to decide whether the chancellor’s answer to the difficulty, the administration of alternative examinations to students only in schools affected by irregularity, is sufficient to overcome any taint. "While it is possible to question * * * the educational wisdom of this solution, it is not for the courts to do so. As long as the act was within the power of the city board [and, here, also the chancellor], which it was, the courts may not interfere. The courts may not under the guise of enforcing a vague educational public policy, suggested to it, assume the exercise of educational policy vested by constitution and statute in school administrative agencies. This is not to say that there may never be gross violations of defined public policy which the courts would be obliged to recognize and correct.” (Matter of New York City School Bds. Assn. v Board of Educ., 39 NY2d 111, 121, supra.) Under the circumstances presented, *368 judicial intervention, of even a temporary nature, was unwarranted and in excess of authority.
There is but one further point to be made. The petitioners seek to compel executive officials to engage in a general course of conduct and in a series of continuous acts, all for the purpose of providing what petitioners would perceive to be an appropriate examination. They would have the school system purchase a more expensive, presumably more secure test, develop and enforce better test administration procedures, and more closely review the test-related activities of teachers, principals, supervisors, and community district officials. It would be impossible for a court to oversee the performance of these acts and it would be "particularly inappropriate” to do so since the "relevant statutory duty involves the exercise of judgment and discretion” on the part of the chancellor. (Matter of Community Action Against Lead Poisoning v Lyons, 43 AD2d 201, 203, affd on opn of App Div 36 NY2d 686.) In this case, petitioners raise "questions of judgment, discretion, allocation of resources and priorities inappropriate for resolution in the judicial arena”. (Matter of Abrams v New York City Tr. Auth., 39 NY2d 990, 992.) The responsibility for resolving these questions is vested in a network of officials and boards, on both the local and State level. To permit this injunction to stand, and this proceeding to be continued, "would in effect attempt displacement, or at least overview by the courts and plaintiffs in litigations, of the lawful acts of appointive and elective officials charged with the management of’ the New York City public school system. (39 NY2d, at p 992.) With these officials, the matter rests.
Accordingly, the order of the Appellate Division should be reversed; the motion for a preliminary injunction should be denied; the preliminary injunction granted by Special Term should be vacated; and the petition should be dismissed.
Chief Judge Breitel and Judges Gabrielli, Jones, Wachtler, Fuchsberg and Cooke concur.
Order reversed, without costs, motion for preliminary injunction denied, preliminary injunction vacated, and petition dismissed.