OPINION OF THE COURT
Eugene R. Wolin, J.
The plaintiffs in this action are the homeless. Often afflicted with a physical or emotional handicap, these destitute men and women are relegated to living in either the streets or the shelter facilities operated by the City of New York. By this action they seek an order directing the Commissioner of the Department of Social Services (hereinafter DSS) to enforce certain regulations, which establish maximum limits for the capacity of each shelter facility.[1] The matter is now before the court on the motion of the plaintiffs for partial summary judgment and the cross motion of the defendants for summary judgment dismissing the complaint.
At issue are two sections of 18 NYCRR: section 491.3 (g) (1) (i) which limits the total capacity of each shelter facility to 200 beds and section 491.10 (o) (9) (iv) which limits the capacity in a sleeping room to 30 beds. At present the city furnishes shelter for thousands of the homeless pursuant to court order at armories and other large facilities throughout the five boroughs. It is conceded that the homeless population lodged at these facilities *267 exceeds the capacity limits set in the regulations.[2] Clearly enforcement of these regulations would have a dramatic and immediate impact not only on the thousands of homeless but on the city generally. The matter is further complicated by the prior litigation between the parties.
The availability and the quality of the shelter facilities and the services provided by the city to the homeless was first challenged in the courts in 1979 (Callahan v Carey, Sup Ct, NY County, index No. 42582/79). After two years of negotiations and with the aid of the court (Wallach, J.) a consent judgment was entered into by the representatives of the homeless, the city and the State. By its terms the judgment requires the city to provide shelter and board for each homeless man who applies for it.[3] The Callahan judgment was entered into in August 1981. At that time the city was operating shelters at two large facilities: the Keener Building on Ward’s Island and Camp LaGuardia in Chester, New York. Pursuant to the judgment the maximum capacity of the Keener facility was set at 450 men; no maximum limit was established for Camp LaGuardia which then sheltered approximately 1,000 men. The State had not yet promulgated the regulations, which are at issue here, in their final form. However, many of the specific space requirements for shelter facilities, which were part of the regulations proposed by the State, were set forth in an appendix to the Callahan judgment. Those requirements were referred to throughout the judgment and the city agreed to comply with those standards. The language of the judgment was also clear that nothing contained therein would limit or interfere with the authority of the Commissioner to enforce the Social Services Law and the regulations set forth in 18 NYCRR. Finally the court retained continuing jurisdiction to permit modification or termination of the judgment as necessary. Modification became necessary shortly thereafter. In the early fall of 1981 the population of homeless in the city increased substantially. The number of homeless in need of shelter outstripped the space available in the existing facilities operated by the city. On October 21, 1981 after a hearing, Justice Wallach issued an order directing the city and *268 the State to open an armory to be operated as a shelter facility. Initially two armories were opened for use as shelters and as the number of homeless has grown additional armories have been opened. At present six armories are operating as shelter facilities in the city. On December 1,1981 subsequent to the original Callahan judgment and the October 1981 order which required the use of armories as shelter facilities, the State promulgated final regulations for shelters for adults (18 NYCRR 491.1 et seq.). As part of the continuing jurisdiction retained by the court in Callahan (supra), Justice Wallach has issued several orders modifying that judgment with respect to capacity limits, as well as more specific items such as the resident to shower ratio, lockers, bedding and transportation. While the standards established by title 18 were implicit in these subsequent orders the regulations themselves have never been explicitly incorporated into the Callahan judgment.
In the instant action plaintiffs argue that nothing in the Callahan litigation constitutes a waiver of their rights under title 18 and that the court can enter an order directing the defendants to enforce the existing regulations. Plaintiffs also ask for damages incidental to their request for enforcement.[4] In urging dismissal the defendants advance several arguments: the plaintiffs lack standing; the issues involved are nonjusticiable; the regulations are not applicable to armories and that the claims presented are precluded by the Callahan judgment.
Aid to the needy is not dependent upon governmental compassion but is a fundamental right guaranteed by the State Constitution (art XVII, § 1). The State has an affirmative duty to aid the needy and this constitutional mandate cannot be ignored in either its letter or its spirit (Tucker v Tola, 43 NY2d 1 [1977]). The plaintiffs herein are recipients of aid in the form of shelter facilities and the regulations at issue concern the operation of those facilities. Title 18 was promulgated to ensure that certain minimum standards were enforced at shelter facilities. Clearly the purpose of these regulations is to protect the homeless. Insofar as the specific sections of title 18 set the minimum standards for the adequacy of the shelter facilities, they affect the fundamental rights of the plaintiffs. The decision by the defendants not to enforce the capacity limits established by the regulations impacts upon interests of the plaintiffs which are protected by the Constitution. Plaintiffs therefore have standing *269 to bring this action (Matter of Bradford Cent. School Dist. v Ambach, 56 NY2d 158 [1982]; Matter of Fritz v Huntington Hosp., 39 NY2d 339 [1976]; Matter of Dairylea Coop, v Walkley, 38 NY2d 6 [1975]). In addition, where the administrative action complained of is a determination by the agency not to enforce its own regulations, the failure to accord standing to those affected would in effect raise an impenetrable barrier to any judicial scrutiny (Matter of Bradford Cent. School Dist. v Ambach, supra; Boryszewski v Brydges, 37 NY2d 361 [1975]).
The concept of justiciability essentially involves a recognition by the court of the constitutional limitation on its authority. By attempting to set broad policy guidelines, the court usurps the function of the executive and legislative branches of government. Cases which involve the courts in the direct management of administrative programs, e.g., the exercise of discretion in the allocation of resources or the establishment of program goals, have been found to be beyond the competence of the court and nonjusticiable (Jones v Beame, 45 NY2d 402 [1978]; James v Board of Educ., 42 NY2d 357 [1977]; Matter of Abrams v New York City Tr. Auth., 39 NY2d 990 [1976]). However, a distinction must be drawn between a decision of the court which imposes its own policy determination on the other branches of the government and a decision which merely enforces the individual rights which have already been conferred by the executive and legislative branches (Klostermann v Cuomo, 61 NY2d 525 [1984]). This case falls within the latter category. Not only do the plaintiffs assert a right under a broad constitutional mandate but they also seek protection pursuant to a specific statutory framework.
The declared policy of the State is to maintain adult care facilities, i.e., shelter facilities, of the highest quality (Social Services Law § 460). To this end the DSS has been given the comprehensive responsibility for the development and administration of programs and the implementation of standards of operation for all facilities. Concomitant with this the Commissioner of DSS is authorized to promulgate rules and regulations for the administration of all public assistance programs (Social Services Law § 34 [3] [f ]). The Commissioner has also been given the responsibility for the inspection and supervision of all facilities (Social Services Law § 461-a) and various enforcement powers (Social Services Law § 460-d). The regulations contained in 18 NYCRR are derived from this statutory framework and are the expression of the policy of the State on this issue. The discretion vested in the DSS to formulate policy, to choose from various options and to allocate resources and establish priorities *270 has been exercised. The regulations set the specific parameters for the rights accorded the plaintiffs under the Constitution and the Social Services Law. In determining whether the regulations apply, the court will not be imposing its own view on the agency but merely enforcing the expressed policy and programs of the State to protect individual rights already acknowledged by the other branches of government (Klostermann v Cuomo, supra). In arguing that the controversy would inject the court into the daily management of shelter facilities and public assistance programs generally and is therefore nonjusticiable, the defendants rely upon Jones v Beame (supra; a suit by private individuals complaining of inhumane treatment of animals in New York City zoos); Bowen v State Bd. of Social Welfare (45 NY2d 402 [1978]; action by a municipality challenging the premature discharging of mental patients and placement into homes and hotels in the community); Matter of Abrams v New York City Tr. Auth. (supra; attempt by government officials to compel the Transit Authority to promulgate standards for acceptable noise levels in the subway system); Matter of Kerness v Berle (85 AD2d 695, affd 57 NY2d 1042 [1982]; mandamus proceeding brought to compel local departments of environmental conservation to identify and prosecute those guilty of discharging waste water into the water table); Matter of Community Action Against Lead Poisoning v Lyons (43 AD2d 201, affd 36 NY2d 686 [1975]; mandamus to require the State to institute a program to control lead poisoning in children); and Matter of Perazzo v Lindsay (30 AD2d 179, affd 23 NY2d 764 [1968]; proceeding brought by residents of the area to compel the Mayor of City of New York to enforce the Administrative Code of City of New York with respect to the licensing of coffee shops in Greenwich Village). In each instance the courts refused jurisdiction holding that the issues involved were nonjusticiable. However, these cases are distinguishable in that the plaintiffs therein were not seeking to vindicate rights which have been afforded them by the executive and legislative branches and guaranteed by the Constitution (Klostermann v Cuomo, supra; Gaynor v Rockefeller, 15 NY2d 120 [1965]). Therefore given the fundamental interest involved and the detailed standards of operation established by title 18 the request for enforcement of the regulations does present a justiciable issue.[5]
By its language 18 NYCRR applies to shelter facilities generally, however, defendants argue that the regulations were not *271 intended to apply to shelters which are in operation in large-scale facilities. By definition a shelter for adults is “an adult care facility established and operated for the purpose of providing temporary residential care, room, board * * * for adults in need of temporary accommodations, supervision and services.” (18 NYCRR 491.2.) Despite this broad definition the defendants raise two arguments: first, that as the armories and camps were not established as shelter facilities and do not have that as their primary function they fall outside the definition and second, that as the existing structures of the armories and camps cannot be brought into compliance with the regulations then the regulations should not be applied to them.
With respect to the first point it can be assumed that the primary use for which an armory is designed and constructed is not to provide shelter for the homeless. Natural disasters may of course create emergency situations which require that it be put to such use. However, the situation presented here is one in which armories have been opened for the express purpose of providing shelter for the homeless and have been continuously operated as shelter facilities for several years. In practical terms for thousands of the homeless, shelter in an armory is the only response by the city and the State to their problems. Their rights, however, are not contingent upon the type of building in which they are housed. The purpose for which a building was originally designed and constructed is irrelevant. The court can only look to its present use and how the structure affects the rights of the homeless. Any building which is operated as a shelter facility is a shelter within the definition in the regulations regardless of any prior or intended use.
As to the second point the defendants argue that as modification of the physical layout of the armories is impossible enforcement of the regulations would only serve to diminish available resources and the services provided to the homeless. Clearly an armory is a structure which presents problems. Living quarters consist of a single large room with rows of cots, there is poor lighting and no privacy. However, an armory does provide space. Applying even a generous square foot to resident ratio an armory can accommodate more than 200 persons (18 NYCRR 491.3 [g] [1] [i]). Similarly limiting the occupancy of the single room to 30 persons (18 NYCRR 491.10 [o] [9] [iv]) or requiring floor-to-ceiling partitions (18 NYCRR 491.10 [o] [9] [vi]) would seem to be incongruous given the scale of the room. However, the regulations are no less binding because the city and the State have chosen inappropriate buildings. Title 18 is certainly not inviolate. The DSS may amend its regulations at any time or *272 promulgate new regulations which specifically provide for the use of armories or other large structures as shelter facilities. Until that event, however, the agency is bound by its own regulations (Matter of Rankin v Lavine, 41 NY2d 911 [1977]; Matter of Jones v Berman, 37 NY2d 42 [1975]; Matter of Catoe v Lavine, 51 AD2d 545 [2d Dept 1976]; Matter of Bates v Toia, 60 AD2d 459, revd on other grounds 45 NY2d 460 [1978]). Nor can the defendants justify the decision not to enforce the regulations because of a lack of suitable alternative facilities (Matter of Lavette M., 35 NY2d 136 [1974]; Matter of Kesselbrenner v Anonymous, 33 NY2d 161 [1973]; Matter of Ellery C., 32 NY2d 588 [1973]). Therefore it is the view of this court that the regulations contained in 18 NYCRR do apply to the operation of shelter facilities in armories and other large structures. However, this is perhaps a two-edged sword in that those regulations contain provisions which permit the DSS to waive the capacity limits at issue in this litigation.
The 200-person capacity limit may be waived upon request and upon a demonstration that “there are compelling conditions which necessitate the establishment of a larger facility;” (18 NYCRR 491.3 [g] [3] [i]) and “the physical plant and proposed program comply with department regulations and applicable local codes.” (18 NYCRR 491.3 [g] [3] [ii].) The environmental standards set forth in 18 NYCRR 491.10 which include the 30 person per room limit may be waived if the DSS determines “that the proposed waiver will not adversely affect the health and safety of residents.” (18 NYCRR 491.3 [¶] [2].) As yet there has been no formal request by the city for a waiver of any of the regulations; however, this must be viewed in the context of the Callahan litigation.
The lawsuit in Callahan (Sup Ct, NY County, index No. 42582/79, supra) was commenced prior to the issuance of any regulations concerning shelter facilities and the consent judgment was entered into before the regulations in title 18 were promulgated in final form. By virtue of the continuing jurisdiction retained by the court the rights of the parties have not remained static but the terms of the judgment have been subject to frequent modification by the court. The reality of this situation is that the parties are working out the terms of the applicable waivers under the supervision of the court. Clearly if the DSS had chosen to apply the regulations to armories initially the determination whether to grant a waiver and the terms thereof would have been within its sole discretion subject to review in a proceeding brought pursuant to CPLR article 78. That the DSS has chosen not to do so does not change the effect *273 of the Callahan litigation. The relevant parties are before the court and the details of the operation of the shelter facilities are subject to examination and modification. The interests of the homeless aré well represented and no greater safeguards would be available if the waiver procedures outlined by the regulations were to be followed. Assuming that a formal waiver request was made by the city for the use of armories, it would in all likelihood be granted by the DSS. At this time the sheer number of the homeless demonstrate a compelling condition which would justify that determination. Under these circumstances requiring strict compliance with the waiver procedure is pointless. To hold otherwise would be to ignore reality, to render a decision in a vacuum. Therefore, with respect to those shelter facilities which are subject to the Callahan consent judgment and its subsequent modifications, compliance with the capacity limits established by 18 NYCRR must be deemed to have been waived by the DSS. The complaint must therefore be dismissed.
Accordingly, the motion of plaintiffs for partial summary judgment is denied and the cross motion of the defendants for summary judgment dismissing the complaint is granted.

. [1] Governor has also been made a party in this lawsuit. However, as authority has been delegated to the Commissioner of the Department of Social Services a judgment against the Governor is not necessary to achieve the relief sought by the plaintiffs.

. The defendants concede that the following facilities are not in compliance with the regulations: (a) Fort Washington Armory, (b) Lexington Avenue Armory, (c) Park Avenue Armory, (d) Atlantic Avenue Armory, (e) Flushing Armory, (f) Franklin Avenue Armory, (g) Williams Avenue Shelter, (h) Harlem Shelter, (i) Camp LaGuardia, (j) Greenpoint Shelter, and (k) Charles H. Gay Complex on Ward’s Island.

. This obligation was extended to homeless women in subsequent litigation (Eldredge v Koch, 118 Misc 2d 163, revd on other grounds 98 AD2d 675 [1st Dept 1983]).

. [2] The claim for monetary damages against the State or State officials is not cognizable in the Supreme Court but must be brought in the Court of Claims CAutomated Ticket Sys. v Quinn, 90 AD2d 738, affd 58 NY2d 949 [1983]).

. Without belaboring the point this argument is further drained of its vitality by the acquiescence of the DSS in the supervision by the court in areas of management prerogative as part of the continuing jurisdiction retained by the court in Callahan v Carey (Sup Ct, NY County, index No. 42582/79).