In the Matter of FERNANDO FERRER, Individually and as President of the Borough of the Bronx, and on Behalf of the CITIZENS OF BRONX COMMUNITY SCHOOL DISTRICT No. 8, et al., Respondents, v NATHAN QUINONES, as Chancellor of the Board of Education of the City of New York, Appellants.

First Department, December 17, 1987

### APPEARANCES OF COUNSEL

*Oscar Holt, III,* of counsel *(Cedric Wiggins* and *Ronald L. Garnett* with him on the brief; *Wiggins, Holt & Garnett,* attorneys), for respondents.

*Francis Caputo* of counsel *(Leonard Koerner, Ronald Younkins* and *Andrew Schwartz,* with him on the brief; *Peter L. Zimroth, Corporation Counsel,* attorneys), for appellants.

### OPINION OF THE COURT

SULLIVAN, J.

We hold that the decision of the Chancellor of the Board of Education of the City of New York ordering the closing of Junior High School 123 (JHS 123) because of its academic deficiencies concerns a matter of educational policy and is thus nonjusticiable. Furthermore, even if the issue is addressed on the merits, it is patently clear that the petitioners have failed to meet their burden of establishing that the Chancellor's determination was arbitrary or capricious.

In November 1985, in its annual Comprehensive Assessment Report (State report), the State Education Department identified 393 New York City public elementary, intermediate and high schools, including JHS 123, as schools in need of assistance. That same month, Chancellor Nathan Quinones reported to the New York City Board of Education (the Board) on the status of the New York City school system, and announced his decision to establish a commission to recommend minimum standards for all city schools. The commission was to include representatives from the city school system, as well as various educational groups such as the Educational Testing Service, Yale University, the Connecticut Department of Education, the United Parents Association and the United Federation of Teachers. The Chancellor subsequently met with

the superintendents of all the community school districts within the city school system to set goals and discuss plans to improve the schools. He provided a school profile for each of the schools listed in the State report, identifying specific deficiencies for each of the schools.

On March 4, 1986, the Chancellor issued Special Circular No. 23, "Chancellor's Implementary Plan for Schools in Need of Assistance", which required the superintendents of local school districts to prepare a plan listing goals and objectives to improve each of the schools identified in the State report, for submission, as required, to the State Education Department, and for review by the Chancellor to determine whether an adequate plan for improvement was being implemented in each school. The circular also advised that minimum standards would be promulgated and that, in conformity therewith, each school would be expected to reduce any educational deficit by 50% within a three-year period.

In May 1986, the Chancellor's commission issued its report setting minimum standards in various areas for all New York City schools. In reading, for example, in an intermediate school such as JHS 123, at least 80% of the school's students should score at or above the State reference point on its 8th grade Performance Competency Test (PCT). In addition, every intermediate school should have an average attendance rate of at least 85%.

After reviewing the goals and objectives submitted for each of the schools identified in the State report, the Chancellor determined that five of the schools, including JHS 123, because of a combination of poor past performance and an inadequate plan to remedy their deficiencies, required more immediate action in order to achieve the minimum standards. The schools selected were not necessarily the worst schools as measured by attendance and test scores.

The five schools were notified that they would be required to achieve one third of their improvement goal during the upcoming 1986-1987 school year, as measured against the school's performance during the 1984-1985 school year. For the 1984-1985 school year, 67.6% of the 8th grade students at JHS 123 were reading at or above the State reference point on the PCT. The average daily attendance rate was 76.1%. Thus, to meet the goals set by the Chancellor, JHS 123 would have had to make only a 1.5% attendance gain and a 2.1% gain in reading scores during the 1986-1987 school year. Additional

resources, including supplemental funding and staff work-shops, were made available to the five schools to assist them in meeting their goals.

In May 1987, at the Chancellor's request, the Superintendent of Community School District No. 8 submitted an assessment of JHS 123 in which he claimed "dramatic improvement in [the school's] tone, image, physical plant, staff morale, and community acceptance", but cautioned that "final proof will be in the results on standardized tests, attendance data, etc., and long-term performance in these areas." All five schools placed on notice for the 1986-1987 school year showed improvement in at least one of the designated areas, except for JHS 123, where both reading scores and the daily attendance rate declined.

On August 5, 1987, the Chancellor announced that JHS 123 would be closed for the 1987-1988 school year. He asked the Superintendent of District No. 8 to redesign the school, and offered whatever assistance was needed to reopen the school in September 1988 with a new program emphasizing mathematics and science. Plans were then drawn up to accommodate those students who were scheduled to attend JHS 123 during the 1987-1988 school year. Seventh graders would enter the seventh grade at the same school they attended the previous year while eighth graders would attend JHS 123, a school less than a mile away. Ninth graders were given the option of attending any one of a number of high schools, or, if the student did not wish to attend high school, the option of going to ninth grade at JHS 120, which is within District 8.

Petitioners, a group consisting of, *inter alia,* the President of the Borough of the Bronx,[1] individually and on behalf of the citizens of Bronx Community School District No. 8, and various individuals associated with JHS 123, either in their official capacity or as parents, thereafter commenced this CPLR article 78 proceeding on August 26, 1987 seeking review of the Chancellor's directive and an order mandating the opening of JHS 123 for the 1987-1988 school year. Respondents, which included, *inter alia,* the Chancellor and the Board, cross-moved to dismiss the petition on the ground that the issues presented were not justiciable, since the matter sought to be reviewed involves decisions concerning the setting of educa-

---

1. With respect to the claims of the Borough President, the petition was dismissed for lack of standing. No appeal was taken from this determination.

tional standards and the management and allocation of Board resources, or, alternatively, on the separate ground that the decision had a rational basis.

At a hearing directed by the court, Max Messer, the Superintendent of District No. 8, testified that the reading scores and attendance data for JHS 123 which he had provided to the Chancellor did not accurately reflect the school's performance during the 1986-1987 school year. The reading scores included those of "limited English proficiency" students. Had the scores of such students been excluded, the school's reading scores would have been higher. Mr. Messer acknowledged, however, that the scores of limited English proficiency students had been included in the JHS 123 reading scores for the base year, and were included in the reading scores for schools throughout District No. 8. He also testified that the attendance data originally provided to the Chancellor was incorrect because it included absences attributable to 195 students who had been the subject of a zoning dispute between Community Districts Nos. 8 and 12, and who had been enrolled at a school other than JHS 123, and had therefore improperly been listed as being absent from JHS 123. Mr. Messer conceded, however, that he "assumed" that these students were attending another school, that he did not know if all 195 students were in fact not properly on the rolls of JHS 123, and, accordingly, that his recalculation could be "skewed".[2]

Dr. Alexander Katz, Administrator of the Board's Office of Student Records, testified that in August 1987 he was asked by the Office of the Chancellor to recalculate the average attendance for JHS 123, excluding those students who had improperly been listed as being absent from that school. After a two-day review of the students' individual records, he concluded that, even after deducting all the absences attributable to those students identified as having been listed as absent from JHS 123 but who, in fact, had been transferred to another school district, attendance at JHS 123 had nevertheless declined from the base year figure.

The Chancellor testified concerning the establishment of minimum educational standards, the identification of schools

---

2. Dr. Katz, who was present during the testimony of Mr. Messer, explained that Mr. Messer's assumption was not correct, and that only 175 of the 195 students whose absences Mr. Messer deducted before recalculating the JHS 123 attendance rate were enrolled in another school. Mr. Messer conceded that the figures upon which he based his calculation were only "somewhere in th[e] neighborhood."

in need of immediate improvement, the special assistance provided to these schools, and their performance during the test year. Since he was measuring the performance of each school against its own past performance, he therefore would expect that the scores of limited English proficiency students at JHS 123 be included in the 1986-1987 calculation inasmuch as those students were included in the base year calculations against which the school's progress was to be measured. When reopened in September 1988 with a redesigned educational program, JHS 123 would, the Chancellor expected, be a "successful institution in terms of student achievement, of student attendance, and * * * will be applauded by the public at large, parents and community leaders."

The court granted the petition, finding that a justiciable issue was presented since the case involved the Chancellor's duty and power under Education Law § 2590-h (8) to "examine and evaluate periodically" schools for maintenance of educational standards. Addressing the merits, although the court did not find the attendance figures upon which the Chancellor relied to be incorrect, it nevertheless allowed, "decisions strictly based on percentages could await a time when there could be no debate as to the exact percentage involved." As for the reading scores, the court found that "reasonable men and reasonable educators [could] disagree as to the exact percentage of quantified improvement attained by the school." Expressing its "serious doubt" as to the "wisdom" of basing educational decisions on these scores, the court concluded that the Chancellor's decision was without a rational basis, and ordered the opening of JHS 123 for the 1987-1988 school year.

This case presents a clear, if not unique, opportunity to define the role of the New York State judiciary under our constitutional and statutory framework in the formulation and implementation of educational policy. By questioning "the wisdom" of an educator in matters purely involving policy, particularly when the figures upon which the Chancellor relied were not found to be incorrect, the hearing court embroiled itself, with neither statutory authority nor judicial precedent, in an area where its scope of review is extremely circumscribed. Most unfortunately, however, even after having crossed the Rubicon that separates questions of law from matters of policy, the court compounded its error by finding that petitioners met their burden of proving that the Chancellor acted irrationally when, at best, they demonstrated only that their decision would have been different from his were

they formulating educational policy in the City of New York. Regrettably, from petitioners' perspective, but ineluctably, they are not, and their opinions, no matter how well articulated or appealing, cannot serve as the basis for a challenge to the Chancellor's determination.

The Chancellor, pursuant to sections 2554 and 2590-h of the Education Law, is vested with the sole authority to establish and maintain the elementary, intermediate and high schools of the City of New York and to set and enforce the educational standards and curriculum requirements in those schools. *(See, Matter of Older v Board of Educ.,* 27 NY2d 333; *Matter of Addabbo v Donovan,* 22 AD2d 383, 388, *affd* 16 NY2d 619, *cert denied* 382 US 905; *Matter of Balaban v Rubin,* 20 AD2d 438, 449-450, *affd* 14 NY2d 193, *cert denied* 379 US 881.) The powers conferred and duties imposed upon the Board under, *inter alia,* Education Law § 2554 (9), which provides for the establishment and maintenance of such schools as the Board "shall deem necessary to meet the needs and demands of the city", devolve upon the Chancellor pursuant to Education Law § 2590-h (17). Thus, the Legislature has clearly, in broad language, left the management of the New York City school system to the Board and the Chancellor.

The Court of Appeals has consistently held that "questions of broad legislative and administrative policy [are] beyond the scope of judicial correction." *(Jones v Beame,* 45 NY2d 402, 408; *see, Klostermann v Cuomo,* 61 NY2d 525, 536; *Matter of Abrams v New York City Tr. Auth.,* 39 NY2d 990, 992.) Accordingly, while courts are empowered "to declare the vested rights of a specifically protected class of individuals, in a fashion recognized by statute * * * the manner by which the State addresses complex societal and governmental issues is a subject left to the discretion of the political branches of government". *(Matter of New York State Inspection, Sec. & Law Enforcement Employees v Cuomo,* 64 NY2d 233, 239-240.)

The question of whether to close a school because of its inability to maintain a minimum level of academic achievement clearly falls within the area of policy determinations best left to those charged by the legislative and executive branches of government with the oversight responsibility for education in New York City. Stripped of its rhetorical flourishes, this case involves nothing more than petitioners' disagreement with the Chancellor's administrative response to his statutorily imposed obligation of determining how best to educate students in New York City. The courts of this State

have consistently held that the doctrine of nonjusticiability applies to such educational policy determinations. For example, in *Matter of New York City School Bds. Assn. v Board of Educ.* (39 NY2d 111), in deciding that the courts could not interfere with the Board's decision to decrease the hours of instruction in the city school system, the Court of Appeals held: "While it is possible to question, as does *amicus* State Commissioner of Education, the educational wisdom of this solution, it is not for the courts to do so. As long as the act was within the power of the city board, which it was, the courts may not interfere. The courts may not under the guise of enforcing a vague educational public policy, suggested to it, assume the exercise of educational policy vested by constitution and statute in school administrative agencies" *(supra,* at 121).

Similarly, in *James v Board of Educ.* (42 NY2d 357), the petitioners sought to enjoin the administration of a comprehensive reading test to public school students, claiming that the integrity of the test had been compromised by the inadvertent advance release of the test. After conducting an investigation, the Chancellor concluded otherwise and directed that the test be given. The petitioners had obtained a preliminary injunction against the scheduled test on the basis of an allegation that the irregularities were much more widespread than the Chancellor believed, and that an unfair test would result in the improper promotion of undeserving students. The Court of Appeals reversed, holding that the issue was "not a matter for the courts" *(supra,* at 359). With respect to the Chancellor's statutory duty, pursuant to Education Law § 2590-j (5) (a), to administer a comprehensive test—implicit in which is the "requirement that the test be administered fairly" *(supra,* at 366)—it was for the Chancellor, the court noted, to determine "whether a particular test, under the relevant circumstances, will satisfy the statutory direction" *(supra,* at 366). Even though the petitioners had uncovered evidence of irregularity beyond that found by the Chancellor, the court held that "[w]hether or not an examination had been so compromised as to strip it of validity as a device for measuring educational achievement is a matter committed to the professional judgment and discretion of those responsible for the administration of the public schools" *(supra,* at 359).

The *James* holding, declaring the nonjusticiability of questions involving the professional pedagogic judgments of those responsible for the administration of the public schools, has

been cited with approval by appellate courts in a variety of contexts dealing with challenges to the lawful acts of those in the executive branch of government. *(See, e.g., Matter of New York State Inspection, Sec. & Law Enforcement Employees v Cuomo,* 64 NY2d 233, *supra* [in a challenge to the closing of a State correctional facility, held that the statutory right to a safe workplace will not be enforced by means of a remedy at law which would require the judiciary to preempt the executive branch's exercise of discretion]; *Gertler v Goodgold,* 107 AD2d 481, *affd* 66 NY2d 946 [in a tenured university professor's challenge to the allocation of office space and other academic amenities, held that the academic and administrative decisions of educational institutions involve the exercise of subjective professional judgments which must be removed from judicial scrutiny]; *Matter of Bennett v City School Dist.,* 114 AD2d 58 [in a challenge to a determination not to place a child in a "gifted" academic program, held that the judicial system is not the proper forum in which to test the validity of an educational decision to place a particular student in a particular program].)

Petitioners argue, nevertheless, that a law question is present which is reviewable by this court, viz., whether the Chancellor is precluded from closing JHS 123 because of his alleged failure to evaluate and monitor the progress of the school in accordance with the mandate contained in Education Law § 2590-h (8), which provides for the promulgation of minimum standards and curriculum requirements, and periodic reviews for compliance. This argument is similar to one presented and rejected by the Court of Appeals in *James (supra),* where, as already noted, the Chancellor was charged with failing to administer fairly a statutorily required comprehensive reading test. The court found that the power to review whether a test was fairly administered did not lie with the courts, holding, "[T]he nub of the issue is who is to decide whether a particular test, under the relevant circumstances, will satisfy the statutory direction. We conclude that the responsibility for this determination rests with the chancellor and, in turn, the board of education and Commissioner of Education" *(supra,* 42 NY2d, at 366).

Similarly, here, the courts are without the authority to decide whether the Chancellor's monitoring of progress complied with the statute. It should be noted that the appropriate avenue for seeking such redress lies with the State Commissioner of Education. *(See,* Education Law § 310 [7].) Petition-

ers, however, have never availed themselves of that remedy. Instead, like the petitioners in *James (supra)*, they are attempting to inject the courts into a matter involving the educational policy judgment of those responsible for the management of the city's public school system. Absent a showing that the Chancellor acted ultra vires, or failed to perform a required act, neither of which is present here, the issue is nonjusticiable. Once the Chancellor has acted in the lawful exercise of his discretion, as he did here after a thorough evaluation of JHS 123 over a two-year period, a court is powerless to review the adequacy of that action. That petitioners, or this court, for ·that matter, might have arrived at a different determination, had they the legal responsibility for the management of the public schools, is irrelevant.

In any event, even were we to reach the merits, it is clear that petitioners have failed to meet their burden of establishing that the Chancellor acted irrationally. The argument that the Chancellor's monitoring was not sufficient pales, particularly when the background of the decision to close JHS 123 is reviewed. The school was one of those found deficient by the State Department of Education. The Chancellor instituted a plan for improvement and monitoring. His office had informed the Superintendent of District No. 8, as early as June 1986, that JHS 123 would be closed if it failed to correct its educational deficiencies. A review a year later established that the performance of the school had declined. Thus, even if the results of the review were found to be totally inaccurate, which they have not, the argument that the Chancellor failed to monitor finds no support.

JHS 123 was found to be deficient in reading scores in the 1984-1985 tests, and, in the crucial 1986-1987 year, using the same base year data, which had included the scores of "limited English proficiency" students, reading scores declined. While not challenging the accuracy of these scores, the hearing court nevertheless questioned the wisdom of basing a determination on such data. That a Judge might disagree with an educator does not make the educator's decision irrational, or even incorrect. Since the reading data was not erroneous, the Chancellor's decision has support in the record and, thus, is not irrational.

The court did not even necessarily disagree with the Chancellor regarding the attendance figures, but held that any decision based on percentages should "await a time when there could be no debate as to the exact percentage involved."

The court's apparent disagreement with the Chancellor's method of evaluation does not provide a basis for overruling his judgment. Clearly, if the circumstances are such that the figures are open to a host of interpretations, a court should defer to the Chancellor, who has the responsibility, and presumably the expertise, to make the studied analysis requisite to a proper evaluation of the school's performance.

Accordingly, the judgment of the Supreme Court, Bronx County (Bertram Katz, J.), entered September 11, 1987, which, *inter alia,* granted the petition and vacated the Chancellor's directive that JHS 123 be closed for the 1987/1988 school year, should be reversed, on the law, the petition denied, the cross motion to dismiss granted and the Chancellor's directive reinstated without costs or disbursements.

KUPFERMAN, J. P. (dissenting). We are met here with a question of educational administration which can rival, *mutatis mutandis,* the situation with which the courts were confronted in *Brown v Board of Educ.* (347 US 483, 349 US 294) and its progeny.

With the deficiency in educational achievement at JHS 123, as outlined in the opinion of the majority, it was incumbent upon the Chancellor and the Board of Education, not just to set standards and goals, but to take action for improvement with "all deliberate speed". Instead, the school was closed.

Even if one were to equate the school with a bookstore selling sexually explicit material *(see, People ex rel. Arcara v Cloud Books,* 68 NY2d 553, per Wachtler, Ch. J), there would still have to be an examination of less restrictive corrective measures.

Should the administration and/or the teachers be changed? Should there be enhanced remedial opportunities for the students? It is arbitrary and capricious, if not simply ludicrous, to close the school. *(See, People v Macbeth Realty Co.,* 63 AD2d 908.)* One cannot have a bill of attainder against a building. The building is not contended to be structurally unsound; it is not alleged to be asbestos-ridden.

While one can accept the conclusion of the Chancellor, in the confused state of the facts, as to the substandard performance of the students at the school, one cannot fault the building. Moreover, under any view of the evidence, there are good students at the school who are being punished by being transferred from their neighborhood, because of a default which is not of their making.

No question of "educational wisdom" is here postulated *(see, New York City School Bds. Assn. v Board of Educ.,* 39 NY2d 111) nor is there any infringement of professional pedagogic judgment *(see, James v Board of Educ.,* 42 NY2d 357). To close the school is to abdicate educational responsibility. Educational policy is not made in a vacuum. To set educational standards and curriculum requirements is one thing, but no good is achieved by nihilism.

The judgment of the Supreme Court (Katz, J.) did not, as the majority opinion would have it, interfere with an educational determination. It set aside a nullity, and left a school for which policy can be made.

The judgment appealed from, vacating the Chancellor's directive, should be affirmed.

MILONAS and SMITH, JJ., concur with SULLIVAN, J.; KUPFERMAN, J. P., dissents in an opinion.

Judgment, Supreme Court, Bronx County, entered on September 11, 1987, reversed, on the law, the petition denied, the cross motion to dismiss granted and the Chancellor's directive reinstated, without costs and without disbursements.