John LOMBARD, Plaintiff,

v.

The BOARD OF EDUCATION OF the
CITY OF NEW YORK, Defendant.

No. 85 CV 2709 (ERK).

United States District Court,
E.D. New York.

Oct. 29, 1986.

Joan Goldberg, New York City, for plaintiff.

Frederick A.O. Schwarz, Jr., Corp. Counsel, City of New York, New York City by Ralph J. Reissman, for defendant.

## ORDER AND DECISION

KORMAN, District Judge.

Plaintiff alleges that the refusal of the defendant Board of Education to appoint him to a teaching position, to refer or recommend him to community school boards for consideration for appointment, or to allow the community school boards to appoint him, has "constructively revoked" his teaching license without due process of law, and in violation of his right to equal protection. Defendant moved for judgment on the pleadings or, in the alternative, for summary judgment, on the ground that plaintiff has been denied neither due process nor the equal protection of the laws. The parties have heretofore been advised that the motion will be treated as one for summary judgment, and given an opportunity to present all pertinent material, as required by Rule 12(c), F.R.Civ.P. All such

material having been carefully considered, defendant's motion is now granted in part and denied in part.

Plaintiff was an elementary school teacher who was appointed by the Board of Education to teach common branch subjects in a New York City public school under his regular (full-time) teaching license for a probationary period of three years commencing on September 6, 1967. During the second year of plaintiff's probationary period, the principal of the school gave plaintiff an "unsatisfactory" rating and submitted a report to the Board of Education recommending discontinuance of his probationary appointment and that plaintiff be directed to submit to a medical examination to determine his fitness to teach. Plaintiff was examined by staff physicians in May and June, 1969. He was found medically unfit for teaching duties and placed on a medical leave of absence until January 31, 1970. The leave was extended through June 30, 1970.

On April 20, 1970, a hearing was held before the Committee of the Superintendent of Schools concerning plaintiff's probationary status. Following this hearing, at which plaintiff presented evidence on his behalf but was not given the opportunity to cross-examine the reports and recommendation of the principal and the various physicians who had examined him, the Committee recommended that plaintiff's probationary appointment be discontinued. The primary ground for the recommendation was "illogical and disoriented conversation." On June 11, 1970, the community school district in which plaintiff's school was located adopted the recommendation of the Committee and voted to terminate plaintiff's probationary appointment. Plaintiff's license was then revoked or deemed revoked, and on May 26, 1971, plaintiff's file number was placed on a circular distributed to principals and superintendents indicating that plaintiff could not be employed in any public school because of the discontinuance of his probationary appointment. *Lombard v. Board of Education*, 440 F.Supp. 577, 580 (E.D.N.Y.1977).

Plaintiff brought two actions pursuant to New York CPLR, Article 78, challenging both the forced leave of absence and the determination to discontinue his probationary appointment, but these were dismissed. In 1972, plaintiff commenced an action here alleging violations of his civil rights and seeking reinstatement of his license, back pay and damages. The action was dismissed without opinion by Judge Travia on the ground that the complaint failed to state a claim for relief.

On appeal, the Court of Appeals for the Second Circuit reversed, finding that although "Lombard did not have tenure and, therefore, presumptively had no property right either as a probationary or substitute teacher ... he was deprived [by the recommendation of the Committee without his being given the right to confront witnesses] of his reputation as a person who was presumably free from mental disorder." *Lombard v. Board of Education*, 502 F.2d 631, 637 (2d Cir.1974), *cert. denied*, 420 U.S. 976, 95 S.Ct. 1400, 43 L.Ed.2d 656 (1975). The Court of Appeals held that since a charge of "illogical and disoriented conversation" imposed a stigma upon the plaintiff, he could claim a deprivation of "liberty" under the due process clause of the fourteenth amendment. Accordingly, the Court ordered a trial "to determine whether appellees have violated [Lombard's] federal constitutional rights." *Id.* at 638.

On remand, *Lombard v. Board of Education*, 440 F.Supp. 577 (E.D.N.Y.1977), Judge Platt dismissed the action after trial. Judge Platt observed that, subsequent to the decision of the Court of Appeals, the Supreme Court had made it clear that a cause of action for deprivation of liberty would not lie in the absence of evidence that the allegedly stigmatizing information had ever been made public. Such evidence, he concluded, was lacking here. *Id.* at 582. Judge Platt also held that plaintiff's claim for reinstatement was moot because although the Board had initially treated plaintiff's license as cancelled, it now recognized the license as reinstated and valid pursuant to a decision of the Commissioner of Education captioned *Matter of Baronat*, 11 Ed.Dept.Rep. 150 (1972). Accordingly, Judge Platt concluded that it was unneces-

sary for him to reach the issue whether the revocation of the license deprived plaintiff of a property interest.[1] Plaintiff alleges that he filed a Notice of Appeal from Judge Platt's order seeking to appeal as a poor person, and that the motion was denied by Judge Platt and, thereafter, by the Court of Appeals.

Plaintiff brings the present action alleging that, although his license has not been formally taken from him, it has been "constructively revoked" because the defendant has prevented him from obtaining employment anywhere in the New York City public school system (Complaint ¶¶ 47, 58).[2] Specifically, plaintiff asserts that defendant has, without a hearing, denied him "the right to work under his license and has denied· him the benefits of such license" (Complaint ¶ 48), that "the Board of Education and/or its administration refus[ed] to grant petitioner a teaching assignment" (Complaint ¶ 56), that "plaintiff responded to an advertizement [sic] and on December 16, 1981, plaintiff was accepted in a program for training for 'Special Education' classes" (Complaint ¶ 31), that on December 18, 1981, without cause, plaintiff was told that he would not be permitted to remain in the program and he was told to leave (Complaint ¶ 32), that the Board refused to refer him to community school boards for consideration for employment (Complaint ¶¶ 26–44), and that he was unable to obtain employment, except sporadically as a substitute teacher, by approaching either the Central Board or the local school districts directly (*Id.*).

Plaintiff further alleges that he "answered an ad for positions in District 25 College Point Queens, and was told at District 25 that all assignments were made through the Central Board and that he should go to the Central Board" (Complaint ¶ 41), that "on May 7, 1982 he reported to District 17,

Brooklyn, and was told he could start work at P.S. 18 as a regular teacher, but when he reported to P.S. 18 the principal refused to hire him as a regular teacher and only permitted him to work on a per diem basis" (Complaint ¶ 36), and that, "[i]n December, 1984, plaintiff answered an ad for an interview at the Penta Hotel recruiting conference. One Louise Markowitz refused to interview him. She said, 'You are an exception ... you do not belong here.' She refused to place him and she told one Geraldine Brooks to 'take him away from my table ...' " (Complaint ¶ 51).

In his affidavit, plaintiff alleges that "[defendant has] notified every community superintendant that [Lombard is] not to be offered a position" (Lombard Aff. ¶ 10), that he has been unable to obtain a job "because the Central Board has refused to permit [his] appointment in *any district* ..." (Lombard Aff. ¶ 24, emphasis in original), that "[t]he Board of Education and ·Ms. Markowitz [the Administrator of the Board's Personnel Office] are *not* permitting me to find employment anywhere in the City of New York" (Lombard Aff. ¶ 5, emphasis in original), that plaintiff has "actually applied for several positions and apparently was accepted until the Central Board learned of my success" (Lombard Aff. ¶ 21), and that he has "found [his] own position only to learn subsequently that there is no job for John Lombard and I should go to the central board to find out WHY" (Lombard Aff. ¶ 4).

Plaintiff alleges that these acts deprived him of his rights to property and liberty without due process of law, and of his right to the equal protection of the laws in violation of the Fourteenth Amendment. The Board of Education argues that even if the factual allegations are taken as true, plaintiff would not be entitled to judgment as a matter of law.

---

**1.** Judge Platt also held that plaintiff's claim for back pay was barred by virtue of the fact that plaintiff had no tenure and thus, even if his license had not been revoked, he would not have been entitled to a job with pay which could now be reimbursed. Plaintiff's claim for damages against the Board of Education was held to be barred by recent decisions limiting such re-

covery as against a school board. 440 F.Supp. at 582–83.

**2.** The validity of plaintiff's teaching license is not at issue. Plaintiff concedes that his license has not been actually revoked and that the Board of Education claims to recognize it as having full force and effect. Complaint ¶¶ 3, 44.

*Plaintiff's Due Process Cause of Action Property Interest Claim*

The Fourteenth Amendment's protection of property is a "safeguard of the security of interests that a person has already acquired in specific benefits." *Board of Regents v. Roth,* 408 U.S. 564, 576, 92 S.Ct. 2701, 2708, 33 L.Ed.2d 548 (1972). Property interests are created and their dimensions are defined with reference to state law. *Id.* at 577, 92 S.Ct. at 2709.

Here, plaintiff's claim to a property interest can be construed as premised on two theories: first, that he is entitled to be appointed by the Board to a teaching position or referred to the community school districts for consideration for a teaching job under his license, and second, that he is at least entitled to a meaningful opportunity to apply for such a job. Only the second theory has any possible merit.

In *Board of Regents v. Roth, supra,* 408 U.S. at 577, 92 S.Ct. at 2709, where it was held that an untenured college teacher had no constitutionally protected property interest in continued employment, the Supreme Court stated:

> To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it.

The fact that plaintiff possesses a teaching license does not give him a legitimate claim of entitlement to employment. A license "confers no more than a mere expectancy of employment, and does not confer any claim to a specific position or, for that matter, to any further employment." *Matter of Lowenstein,* 9 Ed.Dept. Rep. 207, 209 (1970). Under New York law, only teachers who have tenure or *de facto* tenure have a legitimate claim of entitlement to employment. *Longarzo v. Anker,* 578 F.2d 469, 471 (2d Cir.1978); *Gentile v. Wallen,* 562 F.2d 193, 197 n. 5

(2d Cir.1977); *Lombard v. Board of Education,* 502 F.2d 631, 637 (2d Cir.1974), *cert. denied,* 420 U.S. 976, 95 S.Ct. 1400, 43 L.Ed.2d 656 (1975). Plaintiff was never granted tenure, as his probationary appointment was terminated in 1970, prior to the expiration of his probationary period.

Thus, plaintiff has no constitutionally protected property interest in employment as a teacher, and his allegations concerning the Board's refusal, either directly or indirectly, to afford him employment fall far short of stating a cause of action for deprivation of property without due process of law. A job is not something to which, as plaintiff puts it, he "had a right to be assigned as a matter of law" (Complaint ¶ 55). There simply "exists no duty on the part of the Board of Education to appoint anyone to any position in the district." *Matter of Mancini,* 14 Ed.Dept.Rep. 420, 421–22 (1975). *See also Gordon v. Anker,* 444 F.Supp. 49, 51–53 (S.D.N.Y.1977) (The "opportunity to perform duties within [the] teaching license [does not rise] to the level of a property interest ... The due process clause is simply not a panacea for every ill-considered personnel decision"); *Ricca v. Board of Education of the City of School District of the City of New York,* 47 N.Y.2d 385, 393, 418 N.Y.S.2d 345, 391 N.E.2d 1322 (1979) ("A school board remains free, of course, to determine whether to appoint a particular person to a particular position ...").

Plaintiff's second theory, however, is not disposed of so easily. Plaintiff argues, relying on *Matter of Baronat, supra,* 11 Ed.Dept.Rep. 150 (1972), that while his teaching license may not confer any claim of right to employment, it does entitle him to a meaningful opportunity to seek employment pursuant to the license. It is this opportunity which plaintiff contends is a property right entitled to due process protection, and of which he claims he has been deprived as a result of the conduct of defendant in directing the community school districts not to hire him.[3]

3. Defendant denies that it has advised any community school boards not to hire plaintiff. It also appears to rely on the existence of New York Education Law § 2590–e to support its claim, as a matter of law, that it has no influence over the community school boards. It is

In *Paul v. Davis*, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976), the Supreme Court held that constitutionally protected interests in property (and liberty):

> attain this constitutional status by virtue of the fact that they have been initially recognized and protected by state law, and we have repeatedly ruled that the procedural guarantees of the Fourteenth Amendment apply whenever the State seeks to remove or significantly alter that protected status. In *Bell v. Burson*, 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971), for example, the State by issuing drivers' licenses recognized in its citizens a right to operate a vehicle on the highways of the State. The Court held that the State could not withdraw the right without giving petitioner due process.

424 U.S. at 710–712, 96 S.Ct. at 1165–66.

In *Baronat*, Commissioner of Education Nyquist held that the hearing provided pursuant to city school district by-laws § 105–a with respect to termination of a probationary appointment affords insufficient due process to justify cancellation of a teacher's license. Thus, in order for such a termination to be allowed to trigger cancellation of a license, the individual affected must be afforded a full and fair hearing complete with all the procedural safeguards normally mandated by the due process clause—including the right to counsel, the right to present witnesses and the right to cross-examine witnesses against him. Commissioner Nyquist continued:

> The license must be sharply differentiated from the probationary appointment, which affords a given community superintendant and board the opportunity to evaluate the ability of the teacher to perform the duties of a specific position. If an individual's performance under such circumstances is found to be unsatisfactory, the probationary appointment may be terminated in accordance with traditional rules.

11 Ed.Dept.Rep. at 153.

The impetus for Commissioner Nyquist's decision was the enactment, in 1969, of New York Education Law Article 52–A, which "decentralized" the New York City School District into thirty-one separate "community school districts." Pursuant to § 2590–e of that Article, the power to appoint and dismiss elementary school teachers was taken from the Central Board of Education and vested in the local community school districts.[4] As Commissioner Nyquist observed in *Baronat*, this had a profound effect on the utility of a New York City license:

> Prior to the enactment of the decentralization statute and the creation of 31 community school districts as semi-autonomous units of the New York City school system, employment and licensure in that system were, for all practical purposes, synonymous. Termination of employment left the existence of such a license a hollow form, without any legal substance. Since the enactment of Education Law Article 52–A, however, where a teacher is dismissed from employment by one of these 31 community districts, he may be re-employed by any of the other 30 such districts, provided he holds a license. The license, therefore, is now a valuable property right and is entitled, as such, to the protection set forth in the decision in *Hecht v. Monaghan* [307 N.Y.

---

obvious, however, that the existence of a state law prohibiting certain conduct does not amount to proof that the conduct never occurred. Whether or not defendant committed the alleged acts is a question of fact which should not be resolved in a pre-discovery motion for summary judgment

**4.** Another section of Article 52–A, § 2590–j(4)(c), appears to limit the power of the community school districts, permitting them to appoint only teachers "who are assigned to the district by the chancellor from competitive eligible lists." The Board of Education has, however, represented that the districts are not required to hire exclusively from these lists. Thus, although the Board places on those lists only the names of teachers who are newly licensed, any teacher who is seeking employment after his initial appointment has ended may apply directly to the community school districts.

461, 121 N.E.2d 421 (1954) ] and its progeny.

11 Ed.Dept.Rep. at 153.

*Baronat* thus recognized the teaching license as conferring something more than a "unilateral expectation," *Roth, supra,* 408 U.S. at 577, 92 S.Ct. at 2709—it recognized a "legitimate claim of entitlement" with regard to the opportunity to seek employment in all thirty-one community school districts in the New York City school system. *Id.* Like the right to operate a vehicle pursuant to a driver's license recognized in *Bell v. Burson, supra,* 402 U.S. 535, 91 S.Ct. 1586, this "claim of entitlement" could not be withdrawn without due process.[5]

■ Because property rights are defined with reference to state law for the purpose of determining whether a deprivation of such property must be accompanied by due process, *Roth, supra,* 408 U.S. at 577, 92 S.Ct. at 2709; *Goetz v. Windsor Central School District,* 698 F.2d 606, 608 (2d Cir. 1983), and because New York recognizes a teaching license as conferring a "valuable property right" to seek employment which may not be withdrawn without due process, plaintiff states a cause of action for deprivation of property within the meaning of the Fourteenth Amendment. Plaintiff's complaint can be construed to allege that, notwithstanding Education Law § 2590–e, vesting in the community school districts the exclusive power to hire elementary school teachers, the Board has exercised a *de facto* power over the districts in order to prevent his employment and that of other teachers who, like plaintiff, failed to complete their probationary appointments. If true, this would constitute a constructive cancellation of plaintiff's teaching license without the requisite due process hearing.

This is not intended to suggest that defendant would be precluded from establishing a policy with respect to categories of teachers for which it is authorized to do the hiring (e.g., high school and Special Education teachers) to hire only teachers who successfully completed their probationary appointments. The Board could rationally decide that such a policy served its needs, and nothing in the Constitution would prevent it from doing so. Each community school district could likewise adopt such a policy with respect to elementary school teachers like Mr. Lombard. What is significant here is the Board's alleged exercise of a de facto power over the community school districts contrary to state law in order to prevent plaintiff's employment. The effect of this action is to diminish the property rights in the license recognized by New York law, i.e., the opportunity to seek employment in all thirty-one districts.

*Liberty Interest Claim*

■ Liberty as guaranteed by the Fourteenth Amendment denotes the right of the individual to engage in the common occupations of life and to enjoy the privileges recognized as essential to the orderly pursuit of happiness. *Board of Regents v. Roth, supra,* 408 U.S. at 572, 92 S.Ct. at 2706. Plaintiff argues that by exercising its influence over the community school districts so as to prevent them from hiring him, based on the prior termination of his probationary appointment, the Board improperly imposed on him a "stigma of fault" in violation of his right to liberty.

In *Roth,* the Supreme Court stated that where "the State, in declining to re-employ [the plaintiff] imposed on him a stigma or other disability that foreclosed his freedom to take advantage of other employment

5. Subsequent New York State cases have followed *Baronat* in recognizing a distinction between the termination of a probationary appointment and that of a teaching license and requiring proper procedural safeguards to be employed in the latter case. See *Lehman v. Board of Education,* 82 A.D.2d 832, 439 N.Y.S.2d 670 (2d Dept.1981) ("A board of education may not terminate a teaching license without first holding a hearing at which proper procedural safeguards are employed"); *Greenwald v. Com-* *munity School Board No. 27,* 42 A.D.2d 965, 966, 347 N.Y.S.2d 969 (2d Dept.1973) ("We are of the opinion that the questions of license revocation and discontinuance of probationary employment are separate and distinct. All the procedural safeguards required by [*Baronat* ] with respect to license revocation are not automatically required, therefore, in a hearing [to discontinue] a teacher's probationary employment").

opportunities," or made a charge against him that might "seriously damage his standing and associations in his community" or his "good name, reputation, honor, or integrity," the plaintiff may claim a deprivation of liberty under the Due Process Clause. 408 U.S. at 573, 92 S.Ct. at 2707. Subsequent cases have established that to make out such a claim, the plaintiff must show that the stigmatizing information was false, *Codd v. Velger,* 429 U.S. 624, 97 S.Ct. 882, 51 L.Ed.2d 92 (1977), and made public, *Bishop v. Wood,* 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976), by the offending governmental entity, see *Paul v. Davis,* 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 409 (1976).

■ Here, even assuming that the Board's alleged notice to the community school districts not to hire the plaintiff amounted to publication to prospective employers, inasmuch as each school district operates under state law as an independent employer, plaintiff has failed to show that such notice was either false or stigmatizing. Plaintiff has nowhere alleged that the Board notified the school districts of the charges made against him by the Committee of the Superintendent of Schools, i.e., "illogical and disoriented conversation." It was those charges which the Court of Appeals found to be stigmatizing.[6]

Instead, the plaintiff argues only that he has been stigmatized by the Board's alleged notice to the districts that he should not be hired because his probationary appointment was previously terminated.[7] This information is neither false nor necessarily stigmatizing. Plaintiff claims that the Board refuses to hire all licensed teachers whose probationary appointments were

discontinued, and it is not contested that there are myriad reasons for a teacher's termination from probation, not all of them stigmatizing. These include voluntary resignations, and terminations of appointments for reasons related to physical health. In *Matter of Baronat,* Commissioner Nyquist correctly observed that "no stigma of fault necessarily attaches to [the termination of a probationary appointment], nor does it reflect adversely upon the individual's professional competence in the same manner as would a determination to cancel a license predicated upon the basis of "incompetence, inefficiency and weakness in discipline." 11 Ed.Dept.Rep. at 151.

It is well settled that for a discharge to create a "stigma," it must be "something considerably graver than a charge of failure to perform a particular job." *Russell v. Hodges,* 470 F.2d 212, 216–17 (2d Cir. 1972); *Petrozza v. Incorporated Village of Freeport,* 602 F.Supp. 137 (E.D.N.Y.1984); *see also Codd v. Velger, supra,* 429 U.S. at 636–39, 97 S.Ct. at 888–90 (Stevens, J.) (dissenting opinion). It is not sufficient that a discharge or demotion might make a person less attractive as an employee due to the fact that he "simply is not rehired [in this case, retained] in one job but remains as free as before to seek another." *Orshan v. Anker,* 489 F.Supp. 820, 825 (E.D. N.Y.1980), *quoting, Roth, supra,* 408 U.S. at 574, 575, 92 S.Ct. at 2708; *see also, Haron v. Board of Education of the City of New York,* 411 F.Supp. 68, 72–73 (E.D. N.Y.1976). Thus, plaintiff's allegation that the Board notified the school districts that his probationary appointment was terminated is insufficient to state a deprivation of liberty cognizable under the fourteenth

---

**6.** The Court of Appeals stated, with regard to the charges against Lombard, "A charge of mental illness, purportedly supported by a finding of an administrative body, is a heavy burden for a young person to carry through life.... This is not only a finding but a stigma. If it is unsupportable in fact, it does grievous harm to appellant's chances for further employment, as indeed the record demonstrates, and not only in the teaching field." 502 F.2d at 637.

**7.** Even the circular distributed by the Board in 1971 to principals and superintendents, indicat-

ing that plaintiff could not be employed in any public school because of the discontinuance of his probationary service, contained only plaintiff's file number, not his name or any indication of the reason for the placement of his file number thereon. *Lombard v. Board of Education, supra,* 440 F.Supp. at 580. And while plaintiff does allege the existence, in 1979 and 1980, of a "blacklist" which prevented him from obtaining employment (Complaint ¶¶ 8–11, 13, 23), he does not allege that this "blacklist" purported to reveal the reasons for his inclusion either.

amendment, and summary judgment on plaintiff's liberty interest claim is appropriate.

### Plaintiff's Equal Protection Cause of Action

■ Plaintiff's equal protection claim must similarly fail. "The essence of equal protection is that persons similarly situated with respect to challenged government action shall be treated similarly." *School Crossing Guards v. Beame*, 438 F.Supp. 1275, 1282 (S.D.N.Y.1977), *citing, Reynolds v. Sims*, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). Constitutional principles, however, do not require that all persons be treated identically. *Plyler v. Doe*, 457 U.S. 202, 216, 102 S.Ct. 2382, 2394, 72 L.Ed.2d 786 (1982). Thus, in applying the Equal Protection clause to most forms of governmental conduct, a court seeks only the assurance that the classification at issue bears some rational relationship to a legitimate public purpose. *Id.* A stricter level of review is called for only when the challenged classification impinges upon the exercise of a "fundamental right" or disadvantages a "suspect class." *Id.* at 216–18, 102 S.Ct. at 2394–95. Since plaintiff is not a member of a suspect class, and there is no fundamental right at issue, plaintiff's equal protection claim must be reviewed under the rational relationship test.

■ Even if plaintiff's allegations are correct, and the Board, pursuant to a policy, directed the community school boards not to hire plaintiff or any teacher whose probationary appointment was previously discontinued, such a policy is a rational one. The Board could rationally draw a distinction between those teachers who have successfully completed their probationary appointments, and who thus have necessarily been adjudged satisfactory by their supervisors, and those who have not, even though there might be capable teachers in the latter category. Thus, even if the Board's allegedly improper exercise of authority violated plaintiff's due process rights, its alleged refusal to permit plaintiff to be hired based on his failure to satisfy a reasonable condition for employment is not a violation of plaintiff's right to equal protection. Defendant's motion for summary judgment on this claim is therefore granted.

Accordingly, and for the foregoing reasons, defendant's motion for summary judgment is granted in part and denied in part.

SO ORDERED.