Dominick LAVELLE, Plaintiff,

v.

Nathan QUINONES, as Chancellor of the Board of Education of the City School District of the City of New York; Board of Education of the City of New York; Anna Gonzalez, as Chairperson of the Board of Education of Community School District 32 of the City School District of the City of New York; and Board of Education of Community School District 32 of the City School District of the City of New York, Defendants.

No. 87 C 2284.

United States District Court, E.D. New York.

Feb. 19, 1988.

Joel Field, New York City, for plaintiff.

Peter L. Zimroth, Corp. Counsel of the City of New York (Diane J. Morgenroth, Anthony M. Dillof, Assistant Corporation Counsel, of counsel), New York City, for defendant Nathan Quinones.

Halberstam Ellis Zeif Funk Shebitz & Karp, P.C. (George Shebitz, of counsel), New York City, for defendant Anna Gonzalez.

### MEMORANDUM AND ORDER

NICKERSON, District Judge.

Plaintiff Dominick Lavelle, a junior high school principal in the New York City school system, invoking 42 U.S.C. § 1983, brought this action alleging that defendant Nathan Quinones, Chancellor of the Board of Education of the City School District of the City of New York (the Chancellor), deprived Lavelle of his right to due process under the Fourteenth Amendment. The Chancellor ordered the School Board of Community School District 32 (the District Board) not to consider Lavelle's application for the position of Deputy Superintendent. The complaint also names as a defendant Anna Gonzalez, the then Chairperson of the District Board, which supports Lavelle's position on the motions before the court.

The Chancellor moves to dismiss the complaint for failure to state a claim. Lavelle moves for a preliminary injunction restraining the Chancellor from ordering the District Board not to consider the application to be Deputy Superintendent. Because the parties have submitted proof outside the pleadings, the court treats the motions as on summary judgment.

### I. THE FACTS

The critical facts of this case, as shown in affidavits submitted by the parties, are as follows.

Plaintiff is a principal with tenure at Junior High School 111 in District 32 in Brooklyn. He is certified as a school district administrator by the New York State Department of Education and has more than three years supervisory experience. In June 1985, Meryl Friedman, a teacher at the junior high school, complained to the Inspector General of the New York City Board of Education (the City Board) that Lavelle had borrowed $6000 from her in two loans of $3000 each, one in October 1983 and one in January 1984, and thereafter refused to pay them back on the purported ground that they were part of a commitment to contribute to the District Board campaign of Lavelle's father. In September of that year, Friedman also complained to the Chancellor when the District Board declined to press charges against Lavelle.

Pursuant to New York Education Law (Educ.Law) § 2590-l, the Chancellor superseded the District Board solely for the purpose of inquiry into Friedman's accusations

and appointed trustees. They subsequently charged that Lavelle's requests for the loans and his refusals to pay on the ground that the loans were a campaign contribution were improper and unethical and violated the Chancellor's regulations.

Lavelle then requested a hearing pursuant to Educ.Law § 3020–a. That section provides for such a hearing before a panel of three members chosen from a list maintained by the New York State Commissioner of Education (the Commissioner). Under the section the employee has "a reasonable opportunity to defend himself and an opportunity to testify in his own behalf." Each party has the right to be represented by counsel, to subpoena witnesses, and to cross-examine witnesses, all of whom must testify under oath. Either party may appeal the findings and recommendations of the panel to the Commissioner or by a proceeding under Article 78 of the New York C.P.L.R.

A panel conducted hearings and issued its findings and recommendations on March 27, 1987. The panel considered (1) whether the making of the loans constituted chargeable misconduct, and (2) whether Lavelle refused to repay the loans on the ground that Friedman was obligated to contribute to the campaign of Lavelle's father.

The panel said that the loans "at the least, create an appearance of impropriety," "have no place in the public schools," and "jeopardize" the professional relationships of the parties. Nevertheless, the panel found that the charge of making the loans was untimely because not made within the six month time limit provided for in Educ.Law § 2590–j.

A majority of the panel found against Lavelle for his refusal to repay the loans, concluding that by requiring a political contribution to the campaign of his father and Friedman's employer as a member of the District Board Lavelle "created a serious conflict of interest." The majority stated:

Clearly, then, a refusal to repay a loan because of alleged political obligations *is improper*. It introduces an odious element into the supervisor-subordinate relationship. It injects politics into the school system in a way that serves no one. By insisting the loan need not be repaid, Respondent was, in essence, telling Friedman that she owed a continuing financial commitment to keep his father in office. Clearly, public employees must be permitted to participate or refrain from participating in political campaigns as they see fit, and not as their supervisors instruct them. (Emphasis in original)

Because Lavelle later arranged to have his brother repay the loans and because there was no allegation that Lavelle improperly performed his duties as principal, the panel recommended not a discharge but a fine of $4500.

The trustees have appealed the penalty to the Commissioner and urge that Lavelle be discharged. He has brought an Article 78 proceeding and challenged the finding of guilt. Both appeals are pending.

In January 1987 the District Board announced expected vacancies in the positions of Superintendent and Deputy Superintendent and stated the minimum requirements to include New York State certification as a School District Administrator and three years of school supervisory experience. Lavelle applied and was interviewed for the positions. In late June 1987, the District Board created a list of six applicants, including Lavelle, to fill the deputy superintendent vacancy and placed on the agenda for its July 9 public meeting a resolution calling for the appointment of one of the six.

Before the meeting and by letter dated June 30, 1987, the Chancellor wrote to the Chairperson of the District Board that he had learned it was considering Lavelle as deputy superintendent and that he had been "convicted of serious misconduct and conflict of interest by a panel." The letter directed the board not to consider his candidacy. The Chancellor added: "Failure to comply with this directive will subject your District to enforcement action pursuant to the powers and duties vested in my (sic) by law."

By letter dated August 25, 1987, the Chancellor wrote the District Board's new Chairperson, Tito Velez, stating that the Chancellor had learned, among other things, that Lavelle had been asked to work on a summertime per session basis to assist the new superintendent. The Chancellor directed "that as of September 2, 1987, Mr. Lavelle will not be permitted to be employed in any position, on either a full-time or part-time basis" within the board's district office. The order in this second letter is the subject of an Article 78 proceeding filed by Lavelle.

The District Board has yet to fill the position of deputy superintendent. The affidavit of Chairperson Velez states that the panel's findings do not disqualify Lavelle and that the Chancellor has no authority to determine "what weight, if any," the board should give to those findings. The board has suspended the selection process because it believes that the Chancellor would utilize his powers and supersede, suspend or remove the board if it considered Lavelle for the position. *See* Educ.Law § 2590–*l*. The board therefore joins Lavelle in asking the court to enjoin the Chancellor.

## II. THE RELEVANT LAW

Under 42 U.S.C. § 1983 any deprivation under color of state law of rights, privileges, or immunities secured by the Constitution or laws of the United States is actionable. *Parratt v. Taylor,* 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), *overruled on other grounds, Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986). Lavelle claims the Chancellor deprived him of his right to due process secured by the Fourteenth Amendment. The elements of such a claim are (1) that Lavelle had (a) a property interest or (b) a liberty interest, *Board of Regents v. Roth,* 408 U.S. 564, 569–71, 92 S.Ct. 2701, 2705–06, 33 L.Ed.2d 548 (1972), and (2) that the Chancellor deprived him of that interest without due process of law. *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976).

### A. The Claim of a Liberty Interest

■ The complaint's second claim alleges deprivation of Lavelle's liberty because the Chancellor's order injured his reputation in the community and restricted his ability to seek employment. By directing the District Board not to consider Lavelle for a position in the superintendent's office the Chancellor did not deprive him of liberty to pursue a broad range of employment opportunities in the field of education. *Roth, supra,* 408 U.S. at 573, 92 S.Ct. at 2707; *Schware v. Board of Bar Examiners,* 353 U.S. 232, 238–39, 77 S.Ct. 752, 756, 1 L.Ed.2d 796 (1957). Moreover, Lavelle has not shown that the Chancellor stigmatized him by publishing false, defamatory information. *See Clements v. County of Nassau,* 835 F.2d 1000, 1006 (2d Cir.1987). Lavelle has thus not shown he was deprived of a liberty interest.

### B. The Claim of a Property Interest

Lavelle contends that New York State law gave him a right to be considered by the District Board and thus created a property interest. *See Roth, supra,* 408 U.S. at 577, 92 S.Ct. at 2709.

He does not claim a right to the position of deputy superintendent. He says that he was entitled to consideration for that post because (1) New York law conferred hiring authority on the District Board and the Chancellor's order impermissibly frustrated Lavelle's expectation to be considered, and (2) under New York law his school district administrator's certificate gave him the right to be considered for positions for appointment to which it is a prerequisite and the Chancellor had no authority constructively to revoke the certificate.

### (a) The Respective Powers of the Chancellor and the District Board

Lavelle contends that under New York law the District Board had the right to decide whether to consider his application and, therefore, the Chancellor's order was invalid. Even if Lavelle is correct, his interest in the outcome of what is effectively a power struggle between the Chancellor and the District Board may not be suffi-

ciently substantial to be deemed a "property" interest under the due process clause. However, the court does not reach this issue because it has concluded for the reasons hereafter stated that the Chancellor's order did not violate New York law.

Lavelle and the District Board submit three grounds as to why the Chancellor had no authority to issue his order. First, he says that the Education Law, with exceptions not applicable, vests exclusive hiring authority for district positions in the District Board. The second ground is that even if the Chancellor had power to order the board not to consider a candidate, he must first promulgate regulations to guide his discretion. Third, Lavelle contends that the Chancellor's order served as additional punishment for Lavelle's misconduct and thus violated New York statutory provisions giving authority to modify punishment set by a hearing panel punish to the Commissioner or the state courts.

For some time Article 52 of the Education law, applicable to the school districts of cities with 125,000 inhabitants or more, has invested general policymaking authority in central school boards, and makes the superintendent the chief executive officer to enforce the school board's policies and supervise employees. § 2566.

In 1969, because of a variety of problems in the administration of public schools in New York City, the state legislature superimposed on the existing legal structure Article 52–A, commonly known as the Decentralization Law. Applicable only to New York City, this law envisioned policymaking and supervision of all City schools by the central City Board and its chief executive, the Chancellor. *See Duncan v. Nyquist,* 43 A.D.2d 630, 349 N.Y.S.2d 154, 157 (3rd Dep't 1973). The Decentralization Law also divided New York City into community school districts to be operated by district school boards. In particular, "[o]ne apparent intent of Article 52–A was to give local groupings of citizens a greater voice in selecting educational personnel appropriate to such local citizenry." *Id.*

Lavelle contends that the Decentralization Law granted to the District Board the exclusive right to hire a deputy superintendent. The Chancellor argues that his powers as chief executive authorize him to intrude where a board considers for employment one who has a record of misconduct.

The Decentralization Law grants the community boards the power to "appoint, define the duties, assign, promote and discharge all its employees." Educ.Law § 2590–e(2). The law also states: "Each community board shall appoint and assign all supervisory personnel for all schools and programs under its jurisdiction...." Educ.Law § 2590–j(4)(d).

In only one respect does § 2590–j provide that the Chancellor may affect this hiring authority. Subsection two authorizes the Chancellor to "promulgate minimum education and experience requirements for all teaching and supervisory service positions." The Chancellor does not argue that this provision gave him, explicitly or impliedly, the authority to make the order at issue.

The Chancellor argues that his power to act as he did stemmed from his statutory mandate to promote the best interests of the schools and to enforce the policies of the City Board, in particular, its policy against conflicts of interest.

The Chancellor has authority to "promote the best interests of the schools." Educ.Law § 2554(15)(a) (incorporated through Educ.Law § 2590–h(17)). As chief executive he also has the duty to "enforce all provisions of law and all rules and regulations relating to management of the schools ... under the direction" of the City Board. Educ.Law § 2566(2).

Chancellor's Regulation C–110, adopted as the policy of the City Board on May 18, 1983, states, in general that "no employee may have any interest, or engage in any business transaction ... which involves an actual or apparent conflict with the proper discharge of his or her duties." Section 3.1. Both Lavelle and the District Board concede that the City Board had the power to adopt this regulation. The Chancellor had a statutory duty to enforce this conflict of interest regulation, and the only ques-

tion is whether the Decentralization Law prohibits him from issuing his order as a means of enforcement.

Lavelle says that in granting the district boards authority to make personnel decisions, the Decentralization Law restricted the role of the Chancellor to promulgating minimum education and experience requirements and by doing so eliminated any other role for him. Lavelle points out the Decentralization Law in §§ 2590–h(16), (17) provides that the Chancellor has the power and duty to promulgate rules and regulations, and to exercise his powers in a manner, "not inconsistent with the provisions" of the Decentralization Law and "the policies of the city board."

The Chancellor responds that the Decentralization Law provides that the district boards shall have powers and duties "not inconsistent with ... the policies established by the city board." Educ.Law § 2590–e. He urges that the promotion of Lavelle to a deputy superintendent position would not only be inconsistent with the City Board's policy against conflicts of interest but a flagrant challenge to that policy.

■ The New York courts have not read the Decentralization Law to restrict the powers of the Chancellor and the City Board in the manner urged by Lavelle. Although the law produced a fountain of litigation over power conflicts between the Chancellor and the City Board on the one hand and district boards on the other, Lavelle cites no case resolving such a conflict in favor of a district board.

His reliance on *Ambrose v. Community Sch'l Bd.* No. 30, 74 A.D.2d 870, 426 N.Y.S. 2d 45 (2d Dep't 1980) is misplaced. In that case, the Chancellor expressed disagreement with the recommendation of a community superintendent and principal that the district board deny a teacher certification of completion of her probationary period. The court, noting that the community board had the power to terminate her services, observed: "The Chancellor's findings are merely advisory." *Id.* 426 N.Y.S.2d at 46. The Chancellor apparently did no more than offer his opinion. Therefore the

court's comment is either a statement of fact or *dictum* at best.

Where New York courts have decided disputes as to power between a district board and the Chancellor or the City Board, they have consistently found against the district boards. Indeed, Lavelle does not contest that as a general matter City Board policy takes precedence over district board policy. *See, e.g., Community Sch'l Bd. Dist. # 22 v. Board of Educ.*, 44 A.D.2d 713, 354 N.Y.S. 703 (2d Dep't 1974), (invalidating as inconsistent with City Board policy district board's decision to convert two intermediate schools into junior high schools). The courts have also prohibited district boards from effectuating policies having an impact outside the district. *See, e.g., Kryger v. Board of Ed.*, 37 A.D.2d 622, 323 N.Y.S.2d 777 (2d Dep't 1971), (invalidating district board's policy of permitting student transfer to another district as improperly affecting matters outside the district and inconsistent with the city board's integration policy).

The New York courts have not restricted the City Board's powers in personnel matters to setting minimum requirements. For example, those courts have upheld the City Board's excessing policy rules, which mandated the criteria by which district employees were to be laid off and ordered transfer of many employees from one district to another. In *Community Sch'l Bd. 3 v. Board of Educ.*, 68 Misc.2d 66, 326 N.Y.S.2d 130 (Sup.Ct.N.Y.Co.1971), a district board challenged this City Board policy, urging that the Decentralization Law's vesting of personnel decisions in the district boards permitted it to lay off employees according to its own criteria and not those of the City Board. The court, noting that the dispute presented important policy issues, deferred judgment to the Commissioner as the official who could determine those issues in a "more informed manner than the courts." *Id.* 326 N.Y.S.2d at 136.

The Commissioner ruled that the Chancellor and the City Board should prevail "when uniformity of policy throughout the city school district is necessary," and found that the City Board's excessing rules com-

ported with the purposes of the Education Law and with sound educational policy. *Community Sch'l Bd. No. 3 v. Board of Educ.*, 11 Educ.Dep't Rep. 154, 157 (1972). The Supreme Court, Kings County, subsequently relied on this opinion in dismissing another district board's complaint against enforcement of the City Board's excessing policy. *Council of Supervisors and Administrators v. Board of Educ.*, 73 Misc. 2d 783, 342 N.Y.S.2d 398 (Sup.Ct.Kings Co. 1973).

The Court of Appeals has taken the same approach to another provision in the Decentralization Law. In *New York City Sch'l Bds. Assoc. v. Board of Educ.*, 39 N.Y.2d 111, 347 N.E.2d 568, 383 N.Y.S.2d 208 (1976), the Court considered whether the City Board could limit the length of the school day in all city schools despite objection by several district boards. The district boards urged that because the Decentralization Law empowered the chancellor to promulgate minimum educational standards, Educ.Law § 2590–h(8), the statute impliedly left maximum standards, including the maximum length of the school day, to the discretion of the district boards. The court ruled that maximum length of the day could be a "minimum" standard. But it also held in the alternative that by authorizing the Chancellor to enunciate minimum standards the legislature did not foreclose the City Board from exercising its authority to pronounce general policy dictates—even if they constituted other than minimum standards. 347 N.E.2d at 573, 383 N.Y.S.2d at 213.

In short, where the New York courts have deemed uniform control in the city system appropriate they have consistently decided that the powers of the City Board and the Chancellor take precedence over those of the district boards. Certainly uniform treatment throughout the city is appropriate in dealing with conflicts of interest in the administration of the schools. The maintenance of public confidence in the integrity of the administration of the schools is of concern to the entire city. The Chancellor could reasonably conclude that the promotion of one found guilty of a conflict of interest to a position of deputy

school superintendent in one district would sap that confidence throughout the school system. The court thus holds that the Chancellor's power and duty to promote the best interests of the schools and to enforce the City Board's policy against conflicts of interest overrides the District Board's discretion to hire Lavelle.

### (b) The Claim that the Chancellor had to Promulgate Regulations

The District Board contends that even if the Chancellor had the general power to issue the order, he could exercise that power only through duly promulgated regulations. In their absence, the argument is, there is a risk that the Chancellor would act through whim and caprice.

The court assumes, without deciding, that the New York State Administrative Procedure Act applies to the Chancellor. *See* Administrative Procedure Act § 102(1). Moreover, in *Nicholas v. Kahn*, 47 N.Y.2d 24, 389 N.E.2d 1086, 416 N.Y.S.2d 565 (1979), the Court of Appeals emphasized the importance of promulgating regulations where an agency's statutory mandate is relatively open ended: "The safeguard against arbitrary administrative action lies in the promulgation of adequate standards to insure meaningful judicial review." 389 N.E.2d at 1091, 416 N.Y.S.2d at 571.

■ However, New York law did not require the Chancellor to codify in a regulation the circumstances according to which he overrode the District Board's hiring discretion. His regulation against conflicts of interest had been promulgated and adopted as policy by the City Board. Those regulations need not spell out the precise consequences of a violation. *Cf. Lap v. Axelrod,* 97 A.D.2d 583, 467 N.Y.S.2d 917, 919 (3rd Dep't 1983). That a finding of misconduct in office might affect the malfeasor's ability to obtain future promotion should be obvious. *Cf. Slocum v. Berman,* 81 A.D.2d 1014, 439 N.Y.S.2d 967, 970 (4th Dep't), *appeal denied,* 54 N.Y.2d 602, 426 N.E.2d 754, 443 N.Y.S.2d 1025, *appeal dismissed,* 54 N.Y.2d 752, 426 N.E.2d 757, 443 N.Y.S.2d 1033 (1981). Moreover, the New

York courts have said that an administrator is entitled to considerable discretion in deciding whether to proceed by regulation or on an *ad hoc* basis, particularly where personnel decisions are at issue. *See, e.g., Gordon v. Burstein*, 116 A.D.2d 85, 500 N.Y.S.2d 393 (3rd Dep't), *appeal denied*, 68 N.Y.2d 603, 497 N.E.2d 706, 506 N.Y.S.2d 1026 (1986).

### (c) The Claim that the Order was Additional Punishment

The argument that the Chancellor's order improperly inflicted additional punishment on Lavelle for his misconduct presupposes that he invalidly usurped the power of the hearing panel and the Commissioner or the state courts to set punishment.

The Education Law § 3020–a(4) provides that the panel's recommendations after a hearing on charges "shall include the penalty or punishment, if any, of a reprimand, a fine, a suspension for a fixed time without pay or dismissal." As indicated above, the parties may appeal the penalty to the Commissioner, or to the state courts in an Article 78 proceeding. Educ.Law § 3020–a(5). The Chancellor may not modify the penalty. *Cf. Tombler v. Board of Educ.*, 109 Misc.2d 821, 440 N.Y.S.2d 1012, 1019 (Sup.Ct.Suffolk Co.1981) (boards of education have no power to determine punishment under Educ.Law § 3020–a).

The court does not consider the Chancellor's order to be "punishment." The legislature could hardly have supposed that a finding of misconduct would work no detrimental consequences beyond the penalty imposed. Acceptance of Lavelle's argument would in effect entitle him to advance in the New York City educational system as if the finding of misconduct did not exist. It would be fatuous to attribute that result to the legislation.

### (d) Chancellor's Order Authorized under New York Law

The court concludes that New York law does not proscribe the Chancellor's order. Lavelle and the District Board have proffered policy arguments in contending that the Chancellor's actions unwisely rob the district of its independence. But those arguments are more appropriately addressed to the New York authorities.

### (e) The Effect of Plaintiff's Administrative Certification

Alternatively, Lavelle claims that his school district administrator certification gave him a property right to have his application considered and that the order of June 30, 1987, barring consideration of him as deputy superintendent, and the order of August 25, 1987, prohibiting his employment in any position in the district office, constructively and without due process revoked the certification.

In support of his argument Lavelle cites *Lombard v. Board of Education*, 645 F.Supp. 1574 (E.D.N.Y.1986) (per Korman, D.J.). In that case a licensed school teacher alleged that the City Board, without according him procedural due process, had ordered all district boards not to consider him for tenured employment. The court relied on the Commissioner's decision in *Matter of Baronat*, 11 Educ.Dep't Rep. 150 (1972), finding that a teacher's license represented "formal acknowledgement that the individual possesses satisfactory academic credentials for appointment to educational positions consonant with the scope of the license conferred." *Id.* at 151. For that reason and because a stigma of fault attaches upon revocation the Commissioner held the license could not be revoked in the absence of procedural due process. The court in *Lombard* extended this principle to the case where an official constructively revokes the license by actions making its advantages meaningless.

Lavelle's certificate represents the completion of various academic and experiential prerequisites to appointments to all positions, including deputy superintendent, "having responsibilities involving general district-wide administration." 8 N.Y.C.C. R.R. § 80.4(a). *See also* Educ.Law § 3003(1). Loss of the certificate would disqualify him from obtaining such an administrative position. *See, e.g., Matter of Marie Connor*, 22 Educ.Dep't Rep. 313 (1982).

The Chancellor's orders did not purport to disqualify Lavelle from holding positions in any district office other than the one at issue. But the court will assume for purposes of argument that the limitation that those orders placed on the value of his certificate could not be imposed without procedural due process. *See also Drogan v. Ward,* 675 F.Supp. 832 (S.D.N.Y.1987).

The facts on which the Chancellor based his order were found after a full hearing. Section 3020–a of the Education Law provides for, and Lavelle received, such a hearing before the panel, which considered whether he committed the acts constituting misconduct. He testified in his own behalf. Counsel represented him and cross-examined witnesses against him. A stenographer made a record of the proceeding. The due process clause does not require that he receive a second hearing as to the facts.

The question remains whether the due process clause entitles Lavelle to some opportunity to argue that a prohibition against his promotion to deputy superintendent is too harsh a collateral consequence for the misconduct established at the hearing. In cases involving dismissal from a job the Supreme Court has said in *dicta* that "[e]ven where the facts are clear, the appropriateness or necessity of discharge may not be; in such cases, the only meaningful opportunity to invoke the discretion of the decisionmaker is likely to be before the termination takes effect." *Cleveland Board of Education v. Loudermill,* 470 U.S. 532, 543, 544 n. 9, 105 S.Ct. 1487, 1494, 1494 n. 9, 84 L.Ed.2d 494 (1985); *see also Codd v. Velger,* 429 U.S. 624, 627, 97 S.Ct. 882, 884, 51 L.Ed.2d 92 (1977) (revocation of parole).

■ These cases suggest that before the Chancellor's order took "effect" Lavelle may have been entitled to an opportunity to make an argument that the misconduct should not foreclose a promotion to deputy superintendent. He had that opportunity. The District Board had announced that it would make a decision on the hiring of a deputy superintendent on July 9, 1987. The Chancellor's order of June 30, 1987 thus had no immediate injurious impact on Lavelle's certificate. Before July 9, 1987 Lavelle could have asked the Chancellor to amend the order. Moreover, Lavelle could have petitioned the Commissioner, who had statutory power to stay the Chancellor's order and the District Board's decision. Educ.Law §§ 310, 311(2). The Commissioner could then have heard argument and determined whether the Chancellor's order was appropriate. Indeed, because the District Board has suspended the appointment of a deputy superintendent, presumably Lavelle can still avail himself of this opportunity.

To require Lavelle to invoke the powers of the Commissioner is not inconsistent with those cases holding that there is no requirement that a plaintiff exhaust administrative remedies before bringing a § 1983 action. *See, e.g., Patsy v. Florida Board of Regents,* 457 U.S. 496, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982). As the Supreme Court explained in *Williamson County Regional Planning Commission v. Hamilton Bank,* 473 U.S. 172, 105 S.Ct. 3108, 3120, 87 L.Ed. 2d 126 (1985), those holdings generally refer to administrative procedures by which an "injured party" may seek review of an adverse decision. But where the administrative action is not "final" in the sense that it "inflicts an actual, concrete injury," *id.,* a plaintiff must, before injury occurs, take such administrative steps as the law affords.

Prior to any deprivation of the rights represented by his certificate, Lavelle could have submitted arguments to the Chancellor and had the opportunity to be heard before the Commissioner as to whether the finding of misconduct justified barring him from promotion. This is all that due process required. *Cleveland Board of Education, supra,* 470 U.S. at 545–46, 105 S.Ct. at 1495.

## III. CONCLUSION

Plaintiff's motion for a preliminary injunction is denied. The Chancellor's motion to dismiss is granted.

So ordered.