BOARD OF EDUCATION OF COMMUNITY SCHOOL DISTRICT NO. 29 OF THE CITY SCHOOL DISTRICT OF THE CITY OF NEW YORK et al., Respondents, v JOSEPH A. FERNANDEZ, as Chancellor of the City School District of the City of New York, Appellant; COMMUNITY BOARDS NUMBER 3 et al., Intervenors-Respondents.

Second Department, October 5, 1992

### APPEARANCES OF COUNSEL

*O. Peter Sherwood, Corporation Counsel of New York City,* New York City *(Doron Gopstein, Pamela Seider Dolgow* and *Patrick L. Taylor* of counsel), for appellant.

*Levy, Gutman, Goldberg & Kaplan,* New York City *(Philip Kaplan, Gail A. Wechsler* and *Eugene Harley* of counsel), for respondents.

*Halberstam, Ellis, Zeif, Funk, Shebitz & Karp, P. C.,* New York City *(Jeffrey S. Karp* and *George Shebitz* of counsel), for intervenors-respondents.

### OPINION OF THE COURT

BALLETTA, J.

This appeal raises the issue as to whether the defendant Chancellor of the City School District of the City of New York, Joseph A. Fernandez (hereinafter the Chancellor), exceeded his authority when he promulgated certain city-wide procedures relating to the hiring of community school superintendents, which he set out in Special Circular Number 37. This Court finds that he did not. Therefore, the judgment is reversed and it is declared that Special Circular Number 37 is a valid exercise of the Chancellor's authority.

In January 1990 the Chancellor, assertedly motivated by a desire to ensure that only the most qualified individuals were selected as community school superintendents, issued Special Circular Number 37 (hereinafter the Circular) setting forth certain procedures which the community school boards would be required to follow in the hiring of community school superintendents. Pursuant to the Circular, the community school boards were required to submit an evaluation report for each candidate to the Chancellor for his review prior to hiring a new community school superintendent or rehiring an incumbent. Additionally, the Circular mandated the appointment of community screening committees to recommend candidates to the community school boards.

The Circular also set forth specific criteria which local community boards were required to evaluate in making their determination. The community school boards would prepare written evaluations for each candidate, setting forth the criteria considered, and would then submit the evaluations to the Chancellor for his review. The Chancellor would provide the local school boards with his assessment of the selection process, including his assessment of the selection criteria and evaluations and whether the community school board had applied the appropriate selection criteria and evaluation factors to the candidates. If the Chancellor determined that the actions of a community school board were flawed or deficient in any way, he would so "advise the community school board and issue appropriate directives". Special Circular Number 37 was subsequently revised in March 1990 to make it more specific in the requirements to be followed by the local community school boards in choosing a superintendent.

In March 1990 the Board of Education of the Community School District Number 29 commenced the instant action for a judgment declaring Special Circular Number 37 to be invalid on the ground that it usurped the power of the community school boards to employ a community superintendent as provided by Education Law § 2590-e (1) (a). Several other community boards intervened. The Supreme Court granted the plaintiffs' application and declared the Chancellor's Special Circular Number 37 to be invalid and unenforceable. This appeal ensued.

In 1969, due to a variety of problems in the administration of public schools in New York City, the State Legislature added Education Law article 52-A, commonly known as the Decentralization Law (see generally, McGrail, *New York City School Decentralization*, 5 Fordham Urban LJ 239; Rebell, *New York's Decentralization Law, Two and a Half Years Later*, 2 JL & Educ 1). Applicable only to New York City, this law envisioned policy-making and supervision of all city schools by the central City Board and its chief executive officer, the Chancellor. The law also divided New York City into community school districts to be operated by local community school boards, the apparent intent being to give local groupings of citizens a greater voice in selecting educational personnel appropriate to their districts (see, *Lavelle v Quinones*, 679 F Supp 253; *Matter of Council of Supervisory Assns. v Board of Educ.*, 23 NY2d 458, 462; *Matter of Duncan v Nyquist*, 43 AD2d 630; *Mercado v Scribner*, 38 AD2d 444, 446,

*affd* 30 NY2d 811). However, while the local district boards were granted considerable authority to operate schools within their communities *(see,* Education Law § 2590-b [2]), responsibility for decision-making on a city-wide basis remained with a centralized administration, the New York City Board of Education *(see, James v Board of Educ.,* 42 NY2d 357, 365; *see also, Community School Bd. v Board of Educ.,* 44 AD2d 713, 714).

In the instant case, Community School District Number 29 and the intervenor community boards assert that the Decentralization Law granted to the community boards the exclusive power to hire superintendents and that the Chancellor should respect their decisions absent concrete evidence of a candidate's failure to meet minimum standards. In response, the Chancellor argues that his powers as chief executive of the New York City Board of Education authorize him to promulgate city-wide procedures to ensure the high qualifications of personnel and to make sure that appointments are merit-based in order to promote the best interests of the school system and to achieve better education for New York City's children. The Chancellor further contends that, far from usurping the power of local school boards, the Circular simply uniformly requires that the methods that each community board uses in employing a superintendent be in accordance with locally developed criteria.

The conflicting positions taken by the community boards and the Chancellor with respect to the Chancellor's powers to promulgate superintendent selection criteria and procedures are a natural outcome of the overlapping statutory provisions which define their respective authorities. However, although the statutory provisions do indeed overlap and breed conflict, it is clear that, in the instant case, the primacy of authority as between the two sides rests with the Chancellor *(see, Matter of New York City School Bds. Assn. v Board of Educ.,* 39 NY2d 111, 117).

Education Law § 2590-e (1) (a), relied upon by the community school boards, reads, in relevant part, as follows:

"Each community board shall have all the powers and duties, vested by law in, or duly designated to, the local school board districts and the board of education of the city district on the effective date of this article, not inconsistent with the provisions of this article and the policies established by the city board, with respect to the control and operation of all pre-

kindergarten, nursery, kindergarten, elementary, intermediate and junior high schools and programs in connection therewith in the community district. The foregoing shall not be limited by the enumeration of the following, each community board shall have the power and duty to:

"1. a. Employ a community superintendent by contract for a term not to exceed by more than one year the term of office of the community school board authorizing such contract, subject to removal for cause, at a salary to be fixed within the budgetary allocation therefor, subject to the provisions of subdivision two of section twenty-five hundred ninety-j of this article".

On the other hand, Education Law § 2554, which pertains to the powers of the New York City Board of Education, reads, in part, as follows:

"[T]he board of education in a city shall have the power and it shall be its duty: * * *

"13. a. To prescribe such regulations and by-laws as may be necessary to make effectual the provisions of this chapter and for the conduct of the proceedings of said board and the transaction of its business affairs, for the general management, operation, control, maintenance and discipline of the schools, and of all other educational, social or recreational activities and other interests under its charge or direction * * *

"15. a. To perform such other duties and possess such other powers as may be required to administer the affairs placed under its control and management, to execute all powers vested in it, and to promote the best interests of the schools and other activities committed to its care".

Significantly, these powers were given to the Chancellor by Education Law § 2590-h (17), which provides that he shall "[p]ossess those powers and duties [as set forth] in section [2554] * * * the exercise of which shall be in a manner not inconsistent with the provisions of this article and the policies of the city board".

Education Law § 2590-h (16) further provides that the Chancellor has the power and duty to: "Promulgate such rules and regulations as he may determine to be necessary or convenient to accomplish the purposes of this act, not inconsistent with the provisions of this article and the policies of the city board".

Moreover, Education Law § 2590-j (2) provides that: "The

chancellor shall promulgate minimum education and experience requirements for all teaching and supervisory service positions which shall be not less than minimum state requirements for certification, and with the approval of the city board shall create and abolish the titles of all positions in the teaching and supervisory service".

As is readily apparent, the Chancellor, as the chief executive officer of the City Board, is empowered to "[p]romulgate minimum educational standards" throughout the city district (Education Law § 2590-h [8]) and has been granted the authority for the "supervision and direction over the enforcement and observance of the courses of study" (Education Law § 2566 [7]; § 2590-h). "Thus, the city board and the Chancellor are responsible for policy having city-wide impact" *(Matter of New York City School Bds. Assn. v Board of Educ., supra,* at 119). Although Education Law § 2590-b (2) gives the community boards considerable authority to operate their community schools, these powers are limited to matters relating to the community school district *(see, Matter of New York City School Bds. Assn. v Board of Educ., supra; see also, Matter of Roher v Dinkins,* 32 NY2d 180; *Matter of Duncan v Nyquist,* 43 AD2d 630, 631, *supra).* Accordingly, while a community board has the general power to employ a community superintendent, that power may not be exercised in a manner which is inconsistent with the policies established by the New York City Board of Education (Education Law § 2590-e; *see, Matter of Board of Educ.,* 20 Ed Dept Rep 294; *see also, Matter of Green v Board of Educ.,* 77 AD2d 312, 314; *Matter of Board of Educ. v Board of Educ.,* 107 Misc 2d 11, 15).

It is clear that the Chancellor, as chief executive officer of the New York City Board of Education, the body responsible for uniform city-wide public school policy, acted properly within the scope of his powers in setting city-wide procedures to be followed by the community school boards in hiring superintendents.

While at first blush it may appear that this determination is inconsistent with the express statutory authority of the community boards to hire superintendents *(see,* Education Law § 2590-e [1] [a]), the determination of the Court of Appeals in *Matter of New York City School Bds. Assn. v Board of Educ. (supra)* supports this conclusion. In *Matter of New York City School Bds. Assn. (supra)* the issue was whether the central New York City Board of Education had the power, in a negotiated accommodation with the teachers' union, to lower

the hours of instruction in the New York City public school system, contrary to the wishes of certain community school districts. The Court of Appeals held that "[b]ecause this action falls within the central board's powers to establish standards and policies, to bargain collectively with all the city teachers, and to supervise the overall city educational budget, it was not violative of the statutes providing for school district decentralization in the City of New York" *(Matter of New York City School Bds. Assn. v Board of Educ., supra,* at 115-116), despite the apparently clear statutory language of Education Law § 2590-e which vested in the community boards the power and duty to:

"2. appoint, define the duties, assign, promote and discharge all its employees and fix their compensation and terms and conditions of employment, not inconsistent with the provisions of this article or any applicable collective negotiation agreement.

"3. determine matters relating to the instruction of students * * *

"4. generally manage and operate the schools and other facilities under its jurisdiction".

The Court of Appeals further noted that the language of the preamble to Education Law § 2590-e made it clear that the powers of the community boards were to be subject generally to the policies established by the City Board.

The same conclusion is warranted under the circumstances of this case; i.e., that the Chancellor, in promulgating Special Circular Number 37, was acting within his power to promote city-wide policy and that the community boards must act in a manner not inconsistent with such policy. Since the statutory scheme provides the authority for the Chancellor to promulgate the city-wide policy under consideration here, the community school boards' contention that a legislative amendment to the Education Law is necessary is without merit.

Further, "[s]tripped of its rhetorical flourishes, this case involves nothing more than [the Community Boards'] disagreement with the Chancellor's administrative response to his statutorily imposed obligation of determining how best to educate students in New York City" *(Matter of Ferrer v Quinones,* 132 AD2d 277, 283). In *Ferrer,* the Appellate Division, First Department, noted that the courts of this State have consistently held that the doctrine of nonjusticiability applies to educational policy determinations absent a showing that the Chancellor acted ultra vires or failed to perform a required act. As long as the act was within the Chancellor's power, the courts should not interfere.

Here, the Chancellor, when confronted with perceived wide-

spread political corruption and instances of administrative appointments based on favoritism rather than merit, promulgated a city-wide procedure whereby he would review the evaluations of candidates chosen by local community boards based upon recommendations made by community screening committees for the position of superintendent. Essentially, Special Circular Number 37 provided that "[i]f the Chancellor determines that the actions of community school boards are flawed or deficient, in any way, he will so advise the community school board and issue appropriate directives". Notably, the term "appropriate directives" is not defined anywhere in the Education Law or the Circular, and it may, in the future, be a subject of judicial determination as to whether Special Circular Number 37, as written, actually gives the Chancellor a veto power.* The Chancellor's intent in promulgating the Circular was to "assist community school boards in evaluating the educational and managerial strengths and weaknesses of the final candidate and in selecting a community superintendent of the highest educational, professional and personal qualifications, in order to allow all children in the New York City School District to have the benefits that result from having educational supervision and leadership of the highest quality".

Significantly, the Circular furthers the intention of the Decentralization Law by giving local citizens a greater voice in selecting the educational personnel appropriate to their community (see, Lavelle v Quinones, 679 F Supp 253, supra). Notably, the Circular permits each community to formulate its own process by which its community superintendent will be selected and provides for the creation of community screening committees which will develop selection criteria for the evaluation of candidates for the position of school superintendent.

Accordingly, the judgment is reversed, on the law, without costs or disbursements, and it is declared that Circular Number 37 is a valid exercise of authority by the Chancellor of the City School District of the City of New York.

HARWOOD, J. P., ROSENBLATT and RITTER, JJ., concur.

Ordered that the judgment is reversed, on the law, without costs or disbursements, and it is declared that Circular Number 37 is a valid exercise of authority by the Chancellor of the City School District of the City of New York.

---

* Under the facts of this case, we need not address the issue of whether the Chancellor has the power to block the appointment of a community school superintendent.